[Civ. No. 46933. First Dist., Div. Two. Mar. 25, 1980.]

VIRGINIA BILLINGS et al., Plaintiffs and Respondents, v.
CALIFORNIA COASTAL COMMISSION et al.,
Defendants and Appellants.

COUNSEL

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Charles W. Getz IV and Richard C. Jacobs, Deputy Attorneys General, for Defendants and Appellants.

Gerald M. Doppelt, in pro. per., and for Plaintiffs and Respondents.

## OPINION

**TAYLOR, P. J.**—The California Coastal Zone Conservation Commission and Central Coast Regional Commission (Commission) appeal[1] from a judgment in two proceedings granting the petition of Billings et al. (owners) for a peremptory writ of mandate (Code Civ. Proc., § 1094.5).[2] As to one proceeding, the court concluded that the owners had a vested right to exemption from the permit requirements of the California Coastal Act of 1976 (1976 Coastal Act); as to the other, the court concluded that the Commission's action in denying the owners a permit for their minor subdivision was not supported by law, and directed issuance of the permit. For the reasons set forth below, we have concluded that the owners were not exempt but are entitled to a permit.

We turn first to the exemption proceeding. The pertinent facts, as found by the trial court, are as follows: In 1976, petitioners Billings acquired 118 acres of land in San Mateo County. The property is not adjacent to the beach or to the ocean, but is located on Stage Road, two or three miles inland from the coast, about one mile north of Pescadero and four miles south of San Gregorio. The property is rolling hill land with a rural character.

In 1976, the San Mateo County Planning Department approved a minor land division to create three parcels of 25, 26 and 67 acres, respectively, on the property in question.[3] A written permit was issued on

---

[1]Preliminarily, we dispose of the owners' contention that the Commission's notice of appeal, dated February 1, 1979, was not filed within the jurisdictional 60-day period of California Rules of Court, rule 2(a). The owners' contention is predicated on the erroneous assumption that the superior court's minute order of May 8, 1978, was a final and appealable order. The order is not expressly made appealable by Code of Civil Procedure section 904.1. The order also was not entered but merely served on each party, while the subsequent judgment was entered. The court's action in signing the subsequent findings and conclusions and judgment indicated the court considered the May 8 order an interim ruling (cf. *Martino* v. *Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 55-56 [43 Cal.Rptr. 255]). The final judgment was entered on December 29, 1978. The notice of appeal erroneously refers to the judgment dated December 6, 1978, the date the findings and conclusions were made. We, therefore, construe the reference to December 6 as a premature notice of appeal of the judgment entered on December 29, 1978. In any event, the notice of appeal dated February 1, 1979, was filed within the requisite 60-day period.

[2]Public Resources Code section 30801 provides, so far as pertinent, that judicial review of any decision of the Commission shall be pursuant to Code of Civil Procedure section 1094.5.

[3]Petitioners Billings contracted to sell the 25-acre parcel to petitioners Doppelt, and the 26-acre parcel to petitioners Killitz.

December 30, 1976, subject to four conditions; final approval was granted without material change in May 1977, after the conditions had been duly completed. The conditions were purely routine and ministerial and approval of the minor division was substantially completed when the initial permit issued in 1976. County authorities recognized that this permit constituted the final discretionary approval which the county had to give.

The 1976 Coastal Act became effective on January 1, 1977. Public Resources Code section 30608 states, so far as pertinent: "(a) No person who has obtained a vested right *in a development*[4] prior to the effective date of this division . . . ." (Italics added.)

The above statutory exemption is written in broader language than its predecessor, Public Resources Code section 27404, set forth below.[5] ■ The question presented is whether, by virtue of the county's tentative approval of the subdivision map on December 30, 1976, the owners acquired a vested right to subdivide their land.

As Code of Civil Procedure section 1094.5 applies and a fundamental vested right of the owners was involved, the trial court was required to exercise its independent judgment on the evidence (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29]; *Stanson v. San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38, 48-50 [161 Cal.Rptr. 392]). As in reviewing the Commission's action on the exemption the court below exercised its independent judgment, we determine, as a matter of law, whether the findings and conclusions of the trial court lack support in the record (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 700 [139 Cal.Rptr. 700, 566 P.2d 602]). We can overturn its factual findings only if the evidence received by the trial court, including the record

---

[4]Public Resources Code section 30106 provides, so far as pertinent: "'Development' means . . . change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . ."

[5]"If, prior to November 8, 1972, any city or county has issued a building permit, no person who has obtained a vested right thereunder shall be required to secure a permit from the regional commission; providing that no substantial changes may be made in any such development, except in accordance with the provisions of this division. Any such person shall be deemed to have such vested rights if, prior to November 8, 1972, he has in good faith and in reliance upon the building permit diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor. Expenses incurred in obtaining the enactment of an ordinance in relation to the particular development or the issuance of a permit shall not be deemed liabilities for work or material."

of the administrative proceeding, is insufficient, as a matter of law, to sustain the finding (*Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 842-843 [130 Cal.Rptr. 169]).

■ The doctrine of vested rights protects property owners from changes in zoning or other land use regulations which occur before the completion of the owner's development project. (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824]). A vested right to complete the project arises only after the property owner has performed substantial work, incurred substantial liability and shown good faith reliance upon a governmental permit (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546]). The vested rights rule is neither a common law rule nor a constitutional principle, but a manifestation of equitable estoppel (*Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal. App.3d 965 [137 Cal.Rptr. 699]). "Where an owner of property, in good faith reliance upon a governmental representation that construction is fully approved, has suffered substantial detriment by proceeding with development, the government is estopped from prohibiting the project by a subsequent change in law. [Citations.] 'Where no such permit has been issued, it is difficult to conceive of any basis for such estoppel.' [Citations.] '[U]nless the owner possesses *all* the necessary permits, the mere expenditure of funds or commencement of construction does not vest any rights in the development.' [Citation]; italics added.)

"It may be true that '[a]lthough the cases speak of vested rights in terms of reliance upon a *building permit* [citations omitted] . . . a building permit may no longer be a *sine qua non* of a vested right. . . . [U]nder modern land development practices various governmental approvals are required before the issuance of a building permit, each approval pertaining to different aspects of the project, and . . . a vested right might arise before the issuance of a building permit if the preliminary permits approve a specific project and contain all final discretionary approvals required for completion of the project.' [Citations.]" (*Patterson* v. *Central Coast Regional Com., supra*, 58 Cal. App.3d, p. 844.)

■ The record here indicates no "good faith reliance" by the owners on the tentative permit issued on December 30, 1976. Prior to the permit, they spent about $520 for the cost of the survey; all other expenses relating to the subdivision were incurred after the January 1,

1977, effective date of the 1976 Coastal Act. These facts distinguish the instant matter from *Pardee Construction Co.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 471, 481 [157 Cal.Rptr. 184].

Further, the trial court here relied on the "final discretionary approval test," as it concluded that the final approval was ministerial (*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 648 [150 Cal.Rptr. 242, 586 P.2d 556]; *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359]). The uncontroverted evidence here indicated that the four conditions had not been met.[6] This court (Div. Four) recently again rejected the use of this test in a substantially identical situation (*Tosh* v. *California Coastal Com.* (1979) 99 Cal.App.3d 388, 394 [160 Cal.Rptr. 170]), and held that final map approval is required in subdivision developments before a right to complete the subdivision vests (cf. *Oceanic California, Inc.* v. *North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57, 70-74 [133 Cal.Rptr. 664]).

We conclude that the trial court erred as a matter of law in concluding that the owners had acquired a vested right to subdivide before the effective date of the 1976 Coastal Act.

We turn, therefore, to the permit proceeding, in which the trial court was limited to the substantial evidence. Our function is identical to that of the trial court and we review the administrative record to determine whether the Commission's denial of the permit was supported by substantial evidence (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 22, p. 149 [93 Cal.Rptr. 234, 481 P.2d 242]).

As indicated above, the property here in issue was of marginal agricultural quality. All of the owners are natural persons and none is a real estate developer. In addition to the existing barn and farmhouse on the 67-acre parcel, the owners want to build one farmhouse and one barn on each of the two smaller parcels. The owners have offered to execute binding covenants running with the land to guarantee that this will be the limit of their "development" and that there will be no further division of the land. They will not convert the land to nonagricultural purposes, but will maintain the maximum feasible amount of prime and

---

[6]These conditions were a dedication of a right-of-way, submission of plans and profiles for access to the proposed building sites, submission of a soils and geology report, and submission of a parcel map.

nonprime land in agricultural use. They have developed a workable plan to farm most of the land in common, as a unit, in a manner which would cover their costs and yield a moderate profit. This plan would put as much of the land as is feasible into productive agricultural use.

The major contentions on appeal pertain to the interpretation of Public Resources Code section 30250, subdivision (a), which reads as follows: *"New...development,* except as otherwise provided in this division, *shall be located* within, contiguous with, or in close proximity to, existing developed areas able to accommodate it *or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects,* either *individually or cumulatively,* on coastal resources. In addition, *land divisions,* other than leases for agricultural uses, *outside existing developed areas shall be permitted only where 50 percent of the usable parcels in the area have been developed and the created parcels would be no smaller than the average size of surrounding parcels"* (italics added).

Also pertinent are Public Resources Code sections 30241 and 30242, which are set forth below.[7]

---

[7]Section 30241: *"The maximum amount of prime agricultural land shall be maintained in agricultural production* to assure the protection of the areas' agricultural economy, and conflicts shall be minimized between agricultural and urban land uses through all of the following: (a) By establishing stable boundaries separating urban and rural areas, including, where necessary, clearly defined buffer areas to minimize conflicts between agricultural and urban land uses.

"(b) By limiting conversions of agricultural lands around the periphery of urban areas to the lands where the viability of existing agricultural use is already severely limited by conflicts with urban uses and where the conversion of the lands would complete a logical and viable neighborhood and contribute to the establishment of a stable limit to urban development.

"(c) By developing available lands not suited for agriculture prior to the conversion of agricultural lands.

"(d) By assuring that public service and facility expansions and nonagricultural development do not impair agricultural viability, either through increased assessment costs or degraded air and water quality.

"(e) By assuring that all divisions of prime agricultural lands, except those conversions approved pursuant to subdivision (b) of this section, and all development adjacent to prime agricultural lands shall not diminish the productivity of such prime agricultural lands." (Italics added.)

Section 30242: *"All other lands suitable for agricultural use shall not be converted to nonagricultural* uses *unless* (1) continued or renewed agricultural use is not feasible, or (2) *such conversion would preserve prime* agricultural land or *concentrate development consistent with Section 30250.* Any such permitted conversion shall be compatible with continued agricultural use on surrounding lands." (Italics added.)

As each of the above provisions is a new one added by the 1976 Coastal Act, a brief look at its legislative history is useful. In attempting to divine the legislative purpose of the 1976 Coastal Act, a wide variety of factors may illuminate the legislative design, including the history of the times and of legislation on the same subject (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371]).

The predecessor of the 1976 Coastal Act, the California Coastal Zone Conservation Act of 1972 (Pub. Resources Code, § 27000 et seq.) specifically directed the preparation of a comprehensive, coordinated and enforceable plan for the coast (Coastal Plan) (Pub. Resources Code, § 27001, subd. (b)). The Coastal Plan was completed in December 1975, sent to the Governor, and a bill enacting its provisions introduced by Senator Beilenson (Sen. Bill No. 1579).[8] The Legislature, however, rejected the Beilenson bill after many amendments[9] and subsequently enacted Senate Bill No. 1277 (Stats. 1976, ch. 1330). As to the Coastal Plan, the Legislature did not incorporate it by reference but found and declared that some of the plan's recommendations are appropriate for immediate implementation as provided for in the 1976 Coastal Act, while others require additional review (Pub. Resources Code, § 30002).

Particularly helpful is an August 6, 1976, letter[10] the Speaker of the Assembly sent to all members of that body prior to the final vote on Senate Bill No. 1277 in that house. As the letter summarizes the Legislature's discussion and events prior to the final passage of the 1976 Coastal Act, we may properly consider it as part of the legislative history (*In re Marriage of Bouquet, supra*, 16 Cal.3d at pp. 589-590; *Rich v. State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal. Rptr. 512]). The Speaker's letter indicated that Senate Bill No. 1277 incorporated the major provisions of the Beilenson bill, referred to the many revisions, negotiations and compromises that led to the final version, detailed the final 22 major revisions, of which only two are pertinent here: "1. Amendments to make it clear the bill does *not* incorporate by reference the Coastal Plan and that the policies set forth in the bill constitute California's coastal program. (Asked for by most opponents.)"

---

[8]Both the Coastal Plan and Senate Bill No. 1579 were part of the record below, subsequently lost, and included in the record on appeal by stipulation.

[9]4 Senate Committee Reports No. 2 (June 1976) 1-2; 4 Senate Committee Reports No. 4 (Aug., Sept. 1976)1-3.

[10]The letter was also a part of the record below, subsequently lost, and included in the record on appeal by stipulation.

"8. Added language to balance social and economic needs of the people with the need to protect coastal resources. Modified many policies that were absolute by adding terms such as 'where feasible'. (CCEEB; developers; labor; utilities; oil companies; and others.)"

The letter concluded that "A balance has been achieved... between the need to protect essential coastal resources ...and the need to assure continued economic growth and properly sited development in California's Coastal Zone."

This concern with balance is reflected in the basic goals of the 1976 Coastal Act, set forth below,[11] and represents a departure from the 1972 Coastal Act.[12] Thus, the Legislature expressly recognized that conflicts may arise between the different policies of the legislation and specified that *"such conflicts be resolved* in a manner which *on balance* is most protective of *significant coastal resources"* (Pub. Resources Code, § 30007.5; italics added).

In light of the above, we turn to the Commission's specific findings.

---

[11]Section 30001.5: "The Legislature further finds and declares that the basic goals of the state for the coastal zone are to: (a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources.

"(b) *Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state.*

"(c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners.

"(d) Assure priority for coastal-dependent development over other development on the coast.

"(e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (Italics added.)

[12]Section 27001: "The people of the State of California hereby find and declare that the California coastal zone is a distinct and valuable natural resource belonging to all the people and existing as a delicately balanced ecosystem; *that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern* to present and future residents of the state and nation; that in order to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, *it is necessary to preserve the ecological balance of the coastal zone and prevent its further deterioration and destruction*; that it is the policy of the state to preserve, protect, and, where possible, to restore the resources of the coastal zone for the enjoyment of the current and succeeding generations;...." (Italics added.)

■ The Commission found that the owners' proposed development would not be consistent with Public Resources Code sections 30241 and 30242[13] "which require that the maximum amount of prime and non-prime agricultural lands remain agriculturally productive." This finding is an inaccurate summary of the two sections quoted above at footnote 7 on page 737. Section 30241 requires *only* that prime agricultural land (defined by § 30113) be maintained in agricultural production.

We note that one of the rejected provisions of the Beilenson bill, proposed section 30215 (to effect policies 30c, 33a (2) and 36 of the Coastal Plan) required that *both* prime and nonprime land be maintained in agricultural use. As only 10-15 percent of the owners' land is "prime agricultural land," the pertinent provision is section 30242, which provides that other lands suitable for agriculture *shall not be converted* to nonagricultural use *unless such conversion would concentrate development* consistent with section 30250.

This language is substantially different from the rejected portions of the Beilenson bill: proposed section 30218 provided that nonprime agricultural land should not be converted from agricultural use, even in part, if that would "increase tax assessments on *nearby* agricultural parcels"; proposed section 30220 which stated that land divisions "shall not be permitted to reduce agricultural parcels to a size that could be uneconomic or impractical for continued agricultural production on the parcels in question *or on adjoining parcels*"; and proposed section 30221 which would not have allowed land *adjacent* to agricultural land to be divided if that would "have an adverse economic effect on the longterm preservation of agricultural lands" (italics added).

The Legislature in rejecting the above provisions and adopting section 30242 chose the more limited approach of permitting the conversion of nonprime agricultural land to nonagricultural use where such conversion would *concentrate development consistent with section 30250*. Here, in view of the owners' affidavits indicating that they would dedicate the land to agricultural use, there is no evidence of any conversion of the land to a nonagricultural use.

■ Section 30250, quoted so far as pertinent above at page 737, first requires that a new development shall not be located in a pre-

---

[13]All future references are to the Public Resources Code unless otherwise indicated.

viously undeveloped area[14] unless there are adequate public services and the development "will not have *significant adverse effects, either individually or cumulatively*, on coastal resources."

The Commission did not find that the owners' minor subdivision would have a *significant adverse effect*. Rather, the Commission's finding as to sections 30241, 30242 and 30250 focused on its future adverse effect, as it "would encourage similar divisions of other large parcels" and threaten the continued viability of the mainly low intensive agriculture economy of the area. The Commission thus erroneously relied on the precedential impact of the owners' proposed minor subdivision and the difficulty of rejecting other future requests for similar minor subdivisions. Further, the Commission could not base its refusal of the permit on such a speculative future contingency. The Commission clearly has the authority to prohibit any future development whose cumulative effect is both significant and adverse.

The Commission urges that its reference to "significant effect" is sufficient, and points to its reliance on section 21083,[15] a part of the California Environmental Quality Act (CEQA). We note that the particular language of this CEQA provision has been construed to include favorable as well as unfavorable effects on the environment (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 206 [132 Cal.Rptr. 377, 553 P.2d 537]). As the Legislature did not repeat CEQA's elaborate definition of cumulatively in section 30250, and specifically used the narrower term "*significant adverse effect*," we do not think "probable future projects" can or should be read into the term "cumulatively," as used in section 30250. Thus, the term should be given its everyday common sense definition. We conclude that the Commission erred in considering the precedential effect of the owners' minor subdivision.

The evidence does not and cannot support a finding of a significant adverse effect. The addition of two residences and two barns on the two

---

[14]Although the owners argued below that they were "in close proximity" to an existing developed area, one mile from the town of Pescadero, no evidence was introduced on this issue and the Commission did not proceed on this basis.

[15]Section 21083, so far as here pertinent, indicates that a project may have a "'significant effect on the environment'...if *any* of the following conditions exist:...(b) The possible effects of a project are individually limited but *cumulatively considerable*" (italics added). *Cumulatively considerable is then defined to mean incremental effects when viewed* in connection with past projects, other current projects and *probable future projects*.

smaller parcels, the increase in water use and additional traffic, while it may be significant, is not adverse. The Commission's finding is not supported by the evidence and does not meet the statutory requirement.

■ We turn next to the second requirement of section 30250, namely, that land divisions shall be permitted only where 50 percent of the usable parcels in the area have been developed[16] and "*the created parcels would be no smaller than the average size of surrounding parcels*" (italics added).

To ascertain the "surrounding parcels," the Commission applied its interpretative guideline of the parcels within one-fourth of a mile of the property; thus, the Commission considered eight parcels. As these 8 parcels range in size from 5 to 750 acres, and 5 are over 100 acres, the average (mean) size is 286 acres. While the use of the one-fourth mile guideline may not be unreasonable, per se, or in other cases, we think the Commission's use of this guideline in the instant case was arbitrary. The record indicates that at the Regional Commission proceedings, the Regional Commission and the owners had agreed that the "surrounding area" was comprised of the 32 parcels along Stage Road between Pescadero and San Gregorio. This area has a distinctive rural and agricultural character, and is similar to the owners' property. Of these 32 parcels, 22 have already been developed; 10 have not. Fifteen of the 32 parcels are under 16 acres in size;[17] 4 are about 40 acres or more[18] and 13 are over 100 acres or more.[19]

· The record indicates that the Commission also determined that "average" meant the arithmetic mean, computed by adding the total acreage of the eight parcels within the quarter-mile radius and dividing this figure by the number of parcels. The result was the mean of 286 acres, which the Commission then determined made the proposed new parcels of 25 and 26 acres smaller than 50 percent of the "average" in the surrounding area. The Commission also reasoned that it was required to use an arithmetic definition of average in order to have an objective standard and to carry out the legislative intent of preventing "leap frog" development. The Commission's approach ignores the fact that since

---

[16]This criterion is not in issue here.

[17]These 15 range from .4 acres to 16 acres.

[18]These 4 range from 38 to 49 acres.

[19]These 13 range from 102 to 756 acres.

some of the surrounding parcels are so large, the arithmetic mean is necessarily "skewed," even when properly computed on the basis of 32 parcels. Using this mean figure of 137, over ⅔ of the parcels (22 of 32) are "below average" and 40 percent of the parcels (13 of 32) are about 1/10 as large as the "average," an absurd result.

The owners urge that if an arithmetic figure is appropriate, the arithmetic median (half above and half below) is more appropriate as it produces an average of 40 acres, the average (mean) size of the three new parcels to be created by their proposed minor subdivision.

The Legislature's use of the term "average," of course, is ambiguous. In an arithmetic sense, the term could describe either the mean, the median or the mode (the most frequently met figure).

While we can understand the Commission's search for a readily ascertainable and objective arithmetic standard, both in terms of the one-quarter mile guideline, and the arithmetic mean, we do not think that the Legislature intended such a standard. As no particular definition for "average" was provided, we can only conclude that the Legislature used "average" in its everyday sense of the term, to mean typical or representative. Applying this definition to the 32 parcels in the surrounding area, the record indicates that the 25- and 26-acre size of the 2 parcels to be created is no smaller than the average size of the 32 surrounding parcels.

We conclude that the Commission also abused its discretion and acted arbitrarily in applying its one-quarter mile guideline and construing "average" as the arithmetic mean. It follows that the record does not support the Commission's finding that the owners' proposed minor subdivision was contrary to section 30250.

■ The Commission also found that because of the increase in traffic on Highway 1 and in water use, the owners' proposed minor subdivision was prohibited by section 30254, set forth below.[20] The record indicates that this finding also was predicated on the precedential nature of the development and future traffic and water problems rather than the additional burden of the two additional residences and related farm buildings.

---

[20]"New or expanded public works facilities shall be designed and limited to accommodate needs generated by development or uses permitted consistent with the

Specifically, the Commission found that as the instant subdivision could not be distinguished from many similar parcels, it would conflict with the requirement that *limited public services be reserved for coastal-dependent and visitor serving uses.* Section 30254, however, requires that the new development, because of its effect on limited existing services, would *preclude* coastal dependent and other preferred uses. No evidence in the record in the instant case supports such a conclusion. There is no indication of the location of the owners' proposed minor subdivision in relation to existing preferred uses. Thus, the Commission's finding was not supported by the record and provides no basis for the denial of the permit to the owners.

■ Finally, the Commission found that approval of the owners' minor subdivision would prejudice the ability of local agencies to prepare an appropriate local coastal plan pursuant to section 30604, set forth, so far as pertinent below.[21] This finding also was based, in part, on the precedential nature of the instant minor subdivision and the result that "a pattern of land division would be committed." The Commission's finding also referred to the conflict between San Mateo's innovative RM zoning and certain policies of the act, and the necessity for smoothly meshing the coastal planning of adjacent Santa Cruz County, which was "attempting" to implement a policy of keeping large parcels of land intact. The statute requires that new development not *prejudice the ability* of a local government to prepare a local program.

provisions of this division; provided, however, that it is the intent of the Legislature that State Highway Route 1 in rural areas of the coastal zone remain a scenic two-lane road. Special districts shall not be formed or expanded except where assessment for, and provision of, the service would not induce new development inconsistent with this division. *Where existing or planned public works facilities can accommodate only a limited amount of new development, services to coastal-dependent land use, essential public services and basic industries vital to the economic health of the region, state, or nation, public recreation, commercial recreation, and visitor-serving land uses shall not be precluded by other development"* (italics added).

[21]"(a) Prior to certification of the local coastal program, a coastal development permit shall be issued if the issuing agency, or the commission on appeal, finds that the proposed development is in conformity with the provisions of Chapter 3 (commencing with Section 30200) of this division and that the permitted development will not prejudice the ability of the local government to prepare a local coastal program that is in conformity with the provisions of Chapter 3 (commencing with Section 30200). A denial of a coastal development permit on grounds it would prejudice the ability of the local government to prepare a local coastal program that is in conformity with the provisions of Chapter 3 (commencing with Section 30200) shall be accompanied by a specific finding which sets forth the basis for such conclusion."

We do not think, however, that the Legislature intended the local coastal programs to require a moratorium on all developments until each local program is completed. As indicated in our above summary of the legislative history and purposes of the 1976 Coastal Act (as distinct from its predecessor), the Legislature was concerned with balancing protection of coastal resources with development.

The proceeding in question indicates that the Commission was not sufficiently aware of its admittedly difficult and complex case-by-case balancing responsibilities. We note that the instant case, unlike most, involves landowners in good faith seeking a minor subdivision three miles from the coast. No significant natural or scenic coastal resources or other areas designated for special protection, preservation or restoration are threatened. We conclude that the instant record does not support the Commission's denial of the permit. However, the matter must be remanded to the Commission to permit the exercise of its proper discretion in imposing reasonable and appropriate conditions (*Jacobs v. State Bd. of Optometry* (1978) 81 Cal.App.3d 1022, 1034 [147 Cal.Rptr. 225]; *Bank of America v. State Water Resources Control Bd.* (1974) 42 Cal.App.3d 198, 214 [116 Cal.Rptr. 770]; *Larson v. City of Redondo Beach* (1972) 27 Cal.App.3d 332, 338 [103 Cal.Rptr. 592]).

The judgment is affirmed, and the cause remanded to the Commission to proceed in accordance with this opinion.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied April 24, 1980, and appellants' petition for a hearing by the Supreme Court was denied June 4, 1980. Bird, C. J., and Newman, J., were of the opinion that the petition should be granted.