[Civ. No. 5645. Fifth Dist. Feb. 16, 1982.]

SOUTH CENTRAL COAST REGIONAL COMMISSION et al., Plaintiffs and Appellants, v.
CHARLES A. PRATT CONSTRUCTION COMPANY, INC., et al., Defendants and Respondents.

JACK A. FRANKLIN et al., Plaintiffs and Respondents, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

CHARLES A. PRATT CONSTRUCTION COMPANY, INC., Plaintiff and Respondent, v.
CALIFORNIA COASTAL COMMISSION et al., Defendants and Appellants.

832

**COUNSEL**

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Richard C. Jacobs, Deputy Attorney General, for Plaintiffs and Appellants and for Defendants and Appellants.

Ogle, Gallo & Merzon, James B. Merzon and Martin J. Tangeman for Plaintiffs and Respondents and for Defendants and Respondents.

OPINION

**FRANSON, Acting P. J.—**

INTRODUCTION

The basic question posed by this appeal is at what point in the subdivision process does a subdivider acquire a vested right to complete his subdivision without a permit from the California Coastal Commission. ▓ We hold that a vested right to an exemption from the permit requirements of the coastal act (Pub. Resources Code, § 30000 et seq.) arises only when the subdivider is entitled to final map approval according to the requirements of the California Subdivision Map Act (Gov. Code, § 66410 et seq.). This means the subdivider must satisfy all conditions of tentative map approval including the completion or agreement with the local governing body for the completion of the offsite improvements. Since neither subdivider in the instant case had reached the point of entitlement to final map approval by January 1, 1977, the effective date of the coastal act, the judgments must be reversed.

PROCEDURAL CHRONOLOGY

The California Coastal Commission (Commission) appeals from three judgments involving the respondent subdividers' right to continue the development of their respective properties without a coastal permit. In actions No. 49228 and 49300, the superior court ordered the Commission to set aside its decisions denying the subdividers' claims of exemption from the permit requirements of the 1976 California Coastal Act (Pub. Resources Code, § 30000 et seq.). In action No. 51175, the court denied the Commission's request for an injunction to restrain the respondent Pratt from recording a final map and denied the Commission's request to restrain respondents Franklin and Shultz from selling any parcels of their land without a coastal permit.

The trial court found both subdividers had obtained tentative map approval by the county board of supervisors prior to January 1, 1977, the effective date of the 1976 Coastal Act, and both subdividers had incurred liabilities and made expenditures of monies in reliance on the tentative map approval before January 1, 1977.

Citing cases which recognize that under the California Subdivision Map Act, tentative map approval is the final discretionary approval by

the local governing body, thereby giving the subdivider the right to a final map when all conditions of the tentative map approval have been satisfied (*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556]; *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359]), the subdividers persuaded the court below they were exempt from the permit requirements of the coastal act as provided by Public Resources Code section 30608.[1]

For the reasons to be explained, we hold the trial court erred in finding the developers had a vested right in their subdivisions for exemption purposes under the coastal act. We reverse the judgments.

FACTS

*Pratt v. Coastal Commission, Superior Court No. 49300*

Pratt owns 25 acres of real property in San Luis Obispo County described as tract 308 Cabrillo Heights Development. On January 1, 1977, the coastal act became effective and Pratt's land fell within the Commission's jurisdiction.

On May 4, 1973, the San Luis Obispo County Board of Supervisors approved a tentative map for tract 308 which delineated the property into 86 residential lots. The tentative map was subject to certain conditions relating to street grading, paving, driveways, gutters, water, utility extensions, water and sewer lines and extensions, all of which are known as "offsite improvements." The tentative map approval was extended by the county planning commission on October 1, 1974, for two years and was further extended by the board of supervisors on September 28, 1976, for an additional one and one-half years.

On October 12, 1976, grading and improvement plans were approved by the county engineer.

---

[1]Public Resources Code section 30608 provides: "(a) No person who has obtained a vested right in a development prior to the effective date of this division or who has obtained a permit from the California Coastal Zone Conservation Commission pursuant to the California Coastal Zone Conservation Act of 1972 (commencing with section 27000) shall be required to secure approval for the development pursuant to this division; provided, however, that no substantial change may be made in any such development without prior approval having been obtained under this division."

Unless otherwise indicated, all references will be to the Public Resources Code.

In reliance on the grading and improvement approvals, prior to January 1, 1977, Pratt performed some rough grading for street rights-of-way and dirt removal for a drainage pond. According to the Attorney General's report to the South Central Coast Regional Commission (Regional Commission), "recognizable liabilities incurred for the grading and the completing of the subdivision improvements, prior to January 1, 1977, amount[ed] to approximately $46,894.35 ...." The figure was broken down into $40,000 for grading and $6,000 plus for administrative costs.

Nothing further was done on the offsite improvements before January 1, 1977.[2]

The trial court found that prior to January 1, 1977, Pratt incurred substantial expenses and performed substantial work in good faith reliance upon the tentative map approval.

The trial court also found: "12. Although not required as a condition of the tentative map approval, prior to January 1, 1977, petitioner obtained a permit to drill a water well upon Tract 308 from the County of San Luis Obispo Health Department and commenced actual construction thereof. The permit thus obtained was the final discretionary approval required by law for the proposed drilling of such well. In order to drill such well it was necessary for petitioner to incur an obligation of $11,283 to perform such work, which such obligation was incurred by petitioner prior to January 1, 1977 in reliance upon the permit to drill such well.

"13. Prior to January 1, 1977, petitioner incurred substantial expenses and performed substantial work toward the drilling of a water

---

[2]In a declaration to the Regional Commission dated April 14, 1977, Pratt stated, "In order to record a final subdivision map all that was necessary for the developer to do was to either perform the conditions (commonly referred to as 'off-site' improvements) set forth on the tentative map or to enter into a county improvement bond in order to secure the performance of such conditions."

The Attorney General's report to the Regional Commission was consistent with Pratt's statement: "[T]he work which remained to be performed to complete the subdivision improvements, grading and water well installation subsequent to January 1, 1977, consisted of $10,000.00 worth of grading, the installation of a water system at a cost of $45,000.00, the construction of curbs and gutters at a cost of $41,500.00, utility installation at a cost of $9,000.00, the laying of base and paving for the roads within the subdivision at a cost of $47,500.00 and completion of the well installation at a cost of $10,154.70."

well upon Tract 308 in good faith reliance upon the permit for the drilling of such well."

The administrative record reveals that the permit for the well was applied for on December 22, 1976, and was approved on December 28, 1976.

Pratt's attorney indicated at the Commission hearing that the contract for the water well installation was approximately $10,000 and that money "spent prior to the first of the year [was] approximately $700 or $800."

Pratt and a civil engineer associated with the project, one Ben Maddalena, filed declarations in support of the claim of exemption. The gist of the declarations was that all discretionary approvals had been obtained from the county no later than September 1976 and that a final subdivision map could have been recorded prior to January 1, 1977. However, Pratt did not record a final map based on and in reliance on information obtained by Maddalena from the Regional Commission staff that "completion of off-site improvements and recordation of a final subdivision map would be exempt from the new coastal act so long as all discretionary approvals, i.e., the tentative map, were established by the County prior to the end of the year."

In denying the application for a total exemption under the coastal act, the Regional Commission found: "(A) Under the Subdivision Map Act section 66410, et seq. of the Government Code, the act of subdividing land or splitting a lot is not complete if the final map has not been recorded. Thus, the Commission concludes that a permit is required under the Act where a final map was not recorded prior to January 1, 1977. This is the conclusion which the State Commission has reached in each of the subdivision exemptions which it has considered. Since the final map has not been recorded, it is not exempt.

"  .    .    .    .    .    .    .    .    .    .    .    .    .

· "(C) Subsequent to the completion of the Attorney General's report on this claim the applicant submitted information regarding expenditures on the water well. According to the applicant, 7% of the total costs of the well ($11,283.00) were expended between December 28 (the date of final County approval) and Jan. 1, 1977. The $789.81

spent does not constitute a substantial liability and therefore the claim on the water well should be denied."

However, the Regional Commission did grant Pratt the exemption in part: "(B) Under California law an entity may acquire a vested right to perform a development if it [has] lawfully performed substantial work and incurred substantial liabilities in good faith reliance upon an appropriate governmental authorization prior to January 1, 1977. Within these bounds, the applicant has spent $46,894.35 which represents 22.8% of the total [offsite improvements] costs ($205,400.00). This represents a substantial liability. Further, there are no grounds for finding this to have been done with 'unseemly haste.'"

We also note the Regional Commission denied Pratt's claim for a permit because "the proposed project was inconsistent with section 30250(a) on land divisions outside of existing developed areas because only 43% of the useable lots in the area were developed and the created parcels (1/4 acre) would be smaller than the average size (1 acre) of the surrounding rural lots." Section 30250, subdivision (a) provides in part "New development . . . shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it . . . . In addition, land divisions . . . outside existing developed areas shall be permitted only where 50 percent of the useable parcels in the area have been developed and the created parcels would be no smaller than the average size of surrounding parcels." No appeal has been taken from that determination. The Commission thus found that Pratt had a vested right to complete the offsite improvements although he had no vested right to record the final subdivision map.[3]

On the basis of the foregoing facts, the trial court concluded as a matter of law the Pratt subdivision was exempt from the coastal act permit requirements, and the Commission was estopped from denying that exemption.

---

[3]The Commission's action giving Pratt the right to complete the offsite improvements appears to have been a gratuity. Section 30608 does not appear to authorize a "partial" exemption from the coastal act requirements. Nevertheless, the Commission's action appears reasonable in light of Pratt's expenditures and the clear forewarning to Pratt that the proposed subdivision of 86 lots violated the Commission's land density policies. Pratt understandably asserts no claim to a blanket permit for full development based on the Commission's granting a partial exemption. Pratt had only commenced grading and dirt removal by January 1, 1977; thus, he was not at that time irrevocably committed to a one-quarter acre per lot subdivision rather than a one acre per lot subdivision.

*Franklin and Schultz v. The Commission, Superior Court No. 49228*

Respondents Jack Franklin and E. Lee Schultz (hereinafter Franklin) were the owners of 173 acres of hilly grazing land in San Luis Obispo County situated approximately two and one-half miles east of the City of Morro Bay and four miles east of the Pacific Ocean. On January 1, 1977, the land came within the Commission's jurisdiction.

Desiring to divide his property into 6 parcels ranging from 23 to 35 acres in size on October 25, 1976, Franklin obtained the approval of San Luis Obispo County for a tentative map permitting the subdivision. According to Franklin's attorney, the conditions of approval for the tentative map did not require any physical development of the property as the conditions merely amounted to "map notations." However, the record reveals there were also conditions regarding dedication, preparation of a title report, and that the existing reservoirs and any private easements be shown on the parcel map. In addition, there was a condition "that a practical plan and profile for access be submitted to the County Engineering and Planning Departments for approval." It was also stated that compliance with the conditions would bring the proposed subdivision in conformance with the Subdivision Map Act and local ordinances and that a "Final Parcel Map"[4] shall be filed in accordance with the Subdivision Map Act prior to any sale, lease or financing of the subject property within one year from the approval date of the tentative map. The board of supervisors approved the tentative parcel map based on the above conditions.

In his exemption application, Franklin stated the "expected total cost of the development would be $1500 to survey the split and prepare the map work." Franklin also listed as liabilities in October and December 1976, a total of $121.50. Nevertheless, in a declaration filed at the hearing Franklin stated that in reliance upon his ability to proceed with the lot division without a coastal permit, he had made approximately $3,749 in expenditures prior to January 1, 1977. Franklin also stated he had spent approximately 200 hours of his own time which "would not

---

[4]Government Code section 66426 provides that a tentative and final map shall be required for all subdivisions creating five or more parcels, except where "(b) each parcel created by the division has a gross area of 20 acres or more and has an approved access to a maintained public street or highway." Since each parcel of Franklin's proposed subdivision apparently does not have approved access to a public street or highway, a final map will be required.

have been necessary if [he] did not feel that the land would be divided without applying for a coastal permit."

Franklin also filed declarations in the administrative proceedings to support a claim of estoppel. Franklin's engineer, Terence Orton, stated he had attended a Land Surveyor's Association meeting in Buellton, California, on December 8, 1976. At the meeting, a Mr. Hetrick (the Executive Director of the Regional Commission) was the speaker and during "the meeting, and in response to a concern shown by the members, Mr. Hetrick stated that in the normal land split situation any land which came within the extended boundaries of the Coastal Act which was to go into effect January 1, 1977, would not need a coastal permit for a land division so long as a tentative map approval had been obtained from the local authorities prior to the end of 1976. Mr. Hetrick stated that any land divisions which had a tentative map approval prior to the end of 1976 could record a final map after the end of 1976 on an exempt basis unless special or unusual conditions existed with respect to the land division."

Franklin's attorney also read a declaration of Orton into the record at the Regional Commission hearing to the effect that there was no reason why a final map could not have been recorded prior to 1977 as the conditions did not involve construction, and the only reason the work was not done for recordation was on account of the assurances that no coastal permit would be needed to record the map after January 1, 1977, so long as the tentative map had been approved prior to the first of the year.

In his declaration, Franklin stated all tentative approvals had been secured in October 1976, and it was not until February 9, 1977, that Orton informed him the coastal staff had taken a different position and now required a coastal permit for land divisions regardless of the fact that all discretionary approvals had been obtained prior to 1977.

Executive Director Hetrick's version of what he said at the Buellton meeting conflicted with Orton's version. At the Regional Commission hearing Hetrick (who is not an attorney) stated: "During a question and answer period following that dinner meeting, a hypothetical question was asked, as, in effect, of how one went about acquiring a vested right for a land division. My response to that was that our *current advice*, from the Attorney General's office, is, that if you have your Tentative Map approved, and have made some *unknown degree of progress* for

meeting any conditions, that their present advice is that ... *might* establish a vested right. But, in any case, since this was only early December, and the action [*sic*] didn't take effect until January 1st, *they ought to check back to get something firmer.*" (Italics added.)

There was also unsworn testimony from a "researcher" for the Regional Commission that it would have been impossible for Franklin to have received the final map approval and recordation prior to December 31, 1976, and thereby qualify for a vested right.

Neither the Commission nor the Regional Commission was persuaded by the estoppel claim. However, the trial court was and specifically found: "On December 8, 1976, [Franklin's] civil engineer who was in charge of the processing of the tentative and final maps for [Franklin] was advised by the Executive Director of the South Central Coast Regional Commission (a subsidiary of respondent) that any proposed land division would be exempt from the provisions of the Coastal Act of 1976 on a vested rights basis if a tentative map approval had been obtained from the local authorities prior to January 1, 1977. In reliance upon this advice, and for no other reason, [Franklin's] final subdivision map was not recorded until after January 1, 1977. Were it not for such advice, [Franklin] could have and would have had the final subdivision map recorded prior to January 1, 1977."

The trial court also concluded as a matter of law the Commission was estopped from determining Franklin was not exempt from the coastal act.

DISCUSSION

*Vested Rights Under the California Coastal Act*

■  The vested rights rule is predicated upon an estoppel of the governing body and protects property owners from changes in zoning or other land use regulations which occur before the completion of the owner's project. (*Billings* v. *California Coastal Com.* (1980) 103 Cal. App.3d 729, 735 [163 Cal.Rptr. 288]; *Spindler Realty Corp.* v. *Monning* (1966) 243 Cal.App.2d 255, 269 [53 Cal.Rptr. 7], quoting from *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79, 89 [40 Cal.Rptr. 41]; see *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 793 [132 Cal.Rptr. 386, 553 P.2d 546].) A vested right to complete a project arises only after the property owner

has performed substantial work, incurred substantial liabilities, and has shown good faith reliance upon a governmental permit. (*Id.*, at p. 791.)

Historically, the California cases have imposed a *building permit* requirement as the exclusive threshold of a vested right. (See Cunningham & Kremer, *Vested Rights, Estoppel and the Land Development Process* (1978) 29 Hastings L.J. 623; *Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d 785.) In keeping with this precedent, the building permit requirement was incorporated into the 1972 California Coastal Zone Conservation Act.[5]

The statutory exemption of section 30608 is written in more general terms than its predecessor section 27404 in that section 30608 grants an exemption to any person "who has obtained a vested right in a *development* prior to the effective date of this division . . . ." (Emphasis added.) ("Development" is defined in § 30106 as including a subdivision pursuant to the Subdivision Map Act.) Thus, the developers in the present case argue that since a building permit requirement is not expressly included in section 30608, a vested right to complete a project may arise prior to the granting of a building permit.

Several courts in construing section 27404 have acknowledged that "'a building permit may no longer be the *sine qua non* of a vested right if preliminary public permits are sufficiently definitive and manifest all final discretionary approvals required for completion of specific buildings.'" (See *Tosh v. California Coastal Com.* (1979) 99 Cal.App.3d 388, 393 [160 Cal.Rptr. 170]; *Raley v. California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 975, fn. 5 [137 Cal.Rptr. 699]; see *Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d 785, 793-794; *Aries Dev. Co. v. California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 544 [122 Cal.Rptr. 315].)

---

[5]Section 27404 provided: "If, prior to November 8, 1972, any city or county has issued a building permit, no person who has obtained a vested right thereunder shall be required to secure a permit from the regional commission; providing that no substantial changes may be made in any such development, except in accordance with the provisions of this division. Any such person shall be deemed to have such vested rights if, prior to November 8, 1972, he has in good faith and in reliance upon the building permit diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor. Expenses incurred in obtaining the enactment of an ordinance in relation to the particular development or the issuance of a permit shall not be deemed liabilities for work or material."

As noted in *Tosh, supra,* 99 Cal.App.3d at page 394 "[i]n determining which governmental permits other than a building permit may possibly afford the developer a vested right, some courts have applied the final discretionary approval test while others have disregarded whether the final act is discretionary or ministerial and simply look to [whether] the final governmental approval [was obtained]." For example, in *Aries Dev. Co.* v. *California Coastal Zone Conservation Com., supra,* 48 Cal.App.3d 534, the court said the tentative subdivision map approval was the final discretionary approval in determining that the developer had *not* acquired a vested right to develop his property due to lack of good faith reliance. (See also *Tosh* v. *California Coastal Com., supra,* 99 Cal.App.3d at p. 394.) We have been unable to find any case and none has been cited to us where the court has recognized a blanket exemption under the coastal act, or its predecessor, the California Coastal Zone Conservation Act, based on tentative map approval.

On the other hand, several cases have held that without final map approval or other final governmental approvals the developer does not qualify for a vested right as against the California Coastal Commission. (See *Oceanic California, Inc.* v. *North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57, 75 [133 Cal.Rptr. 664]; *Billings* v. *California Coastal Com.* (1980) 103 Cal.App.3d 729, 736 [163 Cal.Rptr. 288], citing *Tosh* v. *California Coastal Com., supra,* 99 Cal.App.3d 388, 394 [160 Cal.Rptr. 170].)

Respondent developers cite *Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d 644 and *Great Western Sav. & Loan Assn.* v. *City of Los Angeles, supra,* 31 Cal.App.3d 403 for the proposition that the final discretionary act in allowing a developer to subdivide his land is the tentative map approval; that final map approval is purely ministerial. However, neither *Youngblood* nor *Great Western* involved the question of vested rights under the coastal act. Those cases stand only for the rule that a local governing body does not have absolute discretion to approve or disapprove a final subdivision map. Where the developer has relied on a tentative map approval with conditions and has produced a final tract map *which satisfies the conditions,* he is entitled to acceptance and approval of that final map without the imposition of new or altered conditions by the local governing agency. (See also Gov. Code, § 66474.1.)

In determining the point where the developer acquires the right to complete his subdivision without obtaining a permit from the Coastal

Commission, we must distinguish the underlying policy requirements of the coastal act from those of the Subdivision Map Act.  ■  The 1976 Coastal Act and its predecessor, the California Coastal Zone Conservation Act of 1972, represent a major statement of overriding public policy regarding the need to preserve the state's coastal resources not only on behalf of the people of our state, but on behalf of the people of our nation. Section 30001 sets forth the legislative findings and declarations: "(a) That the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people and exists as a delicately balanced ecosystem. [¶] (b) That the permanent protection of the state's natural and scenic resources is a paramount concern to present and future residents of *the state and nation.* [¶] (c) That to promote the public safety, health, and welfare, and to protect public and private property, wild life, marine fisheries, and other ocean resources, and the natural environment, it is necessary to protect the ecological balance of the coastal zone and prevent its deterioration and destruction."[6] (Italics added.)

As forcefully explained by our Supreme Court: "The Coastal Act represents a comprehensive scheme to protect and preserve the natural and scenic resources of the coastal zone and to insure that any development which occurs within the zone will be consistent with this overall objective. [Citation.] To that end, *substantial doubts regarding the meaning and effect of the exemption provision [citation] should be resolved against the person seeking exemption....*" (Italics added, *Urban Renewal Agency* v. *California Coastal Zone Conservation Com.* (1975) 15 Cal.3d 577, 588 [125 Cal.Rptr. 485, 542 P.2d 645].)

The Supreme Court has also stated that an expansive view of vested rights would result in "serious impairment of the government's right to control land use policy." (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d 785, 797.)

■  Unlike the coastal act, the fundamental purposes of the Subdivision Map Act are to facilitate orderly community development by regulating and controlling the design and improvement of subdivisions

---

[6]Section 30001 was amended by Statutes 1979, chapter 1090, section 1, page 3940 to add subdivision (d) which provides, "That existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well being of the people of this state and especially to working persons employed within the coastal zone."

and to protect the buying public from exploitation. (*Simac Design, Inc.* v. *Alciati* (1979) 92 Cal.App.3d 146, 157-158 [154 Cal.Rptr. 676]; *City of Tiburon* v. *Northwestern Pac. R.R. Co.* (1970) 4 Cal.App.3d 160, 175 [84 Cal.Rptr. 469]; 62 Ops.Cal.Atty.Gen. 147, 148 (1979).) Generally, with respect to subdivisions of five or more parcels, both a tentative and a final map are required to be filed and approved. (Gov. Code, § 66426.)

Government Code section 66473 provides: "A local agency *shall* disapprove a map for failure to meet or perform any of the requirements or conditions imposed by this division or local ordinance enacted pursuant thereto ...." Government Code section 66419, subdivision (a) provides: "'Improvement' refers to such street work and utilities to be installed, or agreed to be installed, by the subdivider on the land to be used for public or private streets, highways, ways, and easements, as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs as *a condition precedent to the approval and acceptance of the final map thereof.*" (Italics added.)

As explained in 2 Bowman, Ogden's Revised California Real Property Law (Cont.Ed.Bar 1975) section 25.9, page 1212: "Before approval of the final map, the subdivider is required to improve or agree to improve portions of land for public or private streets, highways, ways, and easements necessary for the use of lot owners in the subdivision and for local traffic and drainage needs. See definition of improvement in [Gov. Code, §] 66419. If the subdivider agrees to improve, the governing body must require that the agreement be secured by a bond or a cash deposit. A contract may be executed between the governing body and the subdivider to initiate proceedings to create a special assessment district for financing and constructing required improvements. Such a contract is secured by a faithful performance bond or a cash deposit, if required by the governing body. See [Gov. Code, §] 66462."

Thus, until the subdivider proves that he has performed the requirements and conditions imposed by the local governing body's approval of the tentative map, the local agency must disapprove the final map. As a result, there can be no subdivision under the map act until the conditions are satisfied and no vested right under the coastal act.

In so holding, we specifically reject the "final discretionary approval" test proffered by the subdividers in this case. Although approval of the tentative map may be the last discretionary act by the local governing

agency under the Subdivision Map Act (*Youngblood v. Board of Supervisors, supra,* 22 Cal.3d 644), we believe the overriding environmental policies of the coastal act, including a narrow scrutiny of claims of exemption, support our holding that more is required to obtain a vested right than mere tentative map approval. Moreover, requiring a subdivision which has at least progressed to the point that approval of a final map is truly ministerial accords with the principles of vested rights, i.e., substantial reliance based on governmental permits. And as we have shown under the Subdivision Map Act, tentative map approval without more does not entitle a subdivider to a final map.

█ In the present case, the record shows that Pratt had not satisfied the conditions of the tentative map approval pertaining to offsite improvements before January 1, 1977. (The trial court made no finding that Pratt had completed any of the tentative map conditions.) Mr. Pratt's own declaration of April 14, 1977, and the Attorney General's report to the Regional Commission demonstrate that extensive work remained to be done to complete the offsite improvements after January 1, 1977. Nor had Pratt entered into an agreement with the local agency before January 1, 1977, to complete the improvements as required by Government Code section 66462. We also note that Pratt's architect Merriam wrote a letter to the Commission dated April 18, 1977 (attached as an exhibit to request for exemption). It frankly states, "The applicant is specifically requesting exemption for recordation of his final map *and the performance of conditions necessary to fulfill the requirements of the tentative subdivision map.*" (Italics added.)

Furthermore, the self-serving conclusory declarations by Pratt and his agents to the effect that all discretionary approvals by county officials were obtained before January 1, 1977, cannot suffice for evidentiary proof that the conditions of tentative map approval in fact were satisfied.

Pratt's last minute attempt to acquire a vested right by obtaining a permit and contracting to drill a water well on his property is hardly deserving of discussion. Suffice it to say, the well drilling efforts are irrelevant to the vested rights question since the conditions of tentative map approval were not met, and the well was not one of the required conditions.

The record also shows Franklin's tentative map approval was subject to many conditions requiring local agency approval, such as: "A practi-

cal plan and profile for access be submitted to the county engineering and planning departments for approval." Another condition required that the applicant offer for dedication a strip of land for road widening purposes; that "if the applicant desires serving more than one parcel or lot with domestic water, application must be made to the Health Department for a Domestic Water Supply Permit." Each of these conditions had to be completed before a final subdivision map could be submitted to the county engineer for approval. The record does not disclose whether these conditions had been fulfilled by January 1, 1977.[7] Instead, Franklin and Schultz argued to the trial court the only prerequisite for a claim of vested rights to subdivide their land was approval of the tentative subdivision map plus some relatively minor expenditures of money because this was the final discretionary approval required by the county.

Thus, the trial court's finding that "the approval of [Franklin and Schultz'] tentative map . . . was the final discretionary approval required by law for the proposed division of petitioners' property" is erroneous as a matter of law. Also erroneous is the trial court's conclusory finding that "prior to January 1, 1977, petitioners had obtained all final discretionary approvals required by law for the proposed division of their property."

### The Commission Was Not Estopped to Deny the Applications for Exemptions

Both subdividers claim the Commission was estopped to deny their applications for exemptions because of representations made by members of the Regional Commission staff. However, the estoppel argument fails because the overriding public interest in environmental regulation evidenced by the coastal act far outweighs any injustice which the developers would suffer by being required to obtain a permit from the Commission.

The general standard for equitable estoppel against a governmental agency has been postulated by our Supreme Court as follows: "The government may be bound by an equitable estoppel in the same

---

[7]In his appeal to the Commission, Franklin states, "Prior to January 1, 1977, all conditions of the tentative map were met except those which related to later construction on the lots *because there were no conditions to meet for the lot split*." (Italics added.) As we have explained, the record shows several conditions were attached to tentative map approval.

manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].)

■ As we have explained, the California Coastal Act reflects an important public policy to protect the coastal environment on behalf of the people of our state and nation. The granting of a total exemption to the developers in this case would frustrate that policy to a significant degree. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra*, 17 Cal.3d 785, 797-798.)

Neither subdivider has shown it will suffer irreparable detriment if it is required to obtain a coastal permit. Because Pratt was allowed to complete the offsite improvements, the Commission is committed to granting a permit to complete the subdivision provided it comports with the land density requirements of the coastal act.

As to Franklin's claim to exemption, if, in fact, the proposed subdivision is not inconsistent with the policies of the act, the developer "presumably will experience little difficulty in securing the requisite permits and proceeding in an expeditious manner with the completion of the project." (*Urban Renewal Agency* v. *California Coastal Zone Conservation Com., supra*, 15 Cal.3d 577, 588.)

The judgments are reversed.

Andreen, J., concurred.

**PETTITT, J.*** —I dissent. Not only would I construe the facts to support the judgment of the trial court, but I believe an unjustified emphasis is placed by the majority on the stated purpose of the coastal act as it applies to the facts of these consolidated actions. In balancing equities, I would recognize the nonrecurring rights of the individual landowners who had begun their projects in reliance on tentative map approvals before the coastal act became effective as to them. I would not deny the California Coastal Commission its powers as set out in the

*Assigned by the Chairperson of the Judicial Council.

coastal act (Pub. Resources Code, § 30000 et seq.), but I would expect them to be applied prospectively in these actions.

Such a holding does not dilute the long range integrity of the coastal act. It merely recognizes the preexisting rights of individuals acquired before the coastal act became effective as opposed to what amounts to an ex post facto application of a new state imposed mandate. Pratt and Franklin got tentative approval for their developments from the one layer of state mandated bureaucracy which had jurisdiction at that time. They incurred liabilities and made expenditures of monies in reliance on those approvals. Thereafter, a new state authority is superimposed which, in effect, seeks to change the rules retroactively.

Under such circumstances, I find more logic and fairness in applying the rule of law set out in *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556], and in *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359]. Applying the law of those cases comports with the recognition of existing individual rights as expressed in the coastal act itself (Pub. Resources Code, § 30608) without doing violence to newly pronounced and laudable goals of the coastal act. The landowners should be allowed to complete their projects in compliance with conditions imposed under the laws applicable when they started. In this case that is the Subdivision Map Act (Gov. Code, § 66410 et seq.). I would hold Pratt and Franklin acquired vested rights under that act.

A petition for a rehearing was denied March 15, 1982, and the opinion was modified to read as printed above. Pettit, J.,* was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied May 20, 1982.

---

*Assigned by the Chairperson of the Judicial Council.