[No. S059847. Apr. 30, 1998.]

LANDGATE, INC., et al., Plaintiffs and Appellants, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

## COUNSEL

Jeffer, Mangels, Butler & Marmaro, Benjamin M. Reznik, John M. Bowman, Monica Witt, Reznik & Reznik, Fred N. Gaines, Kevin M. Kemper and L. Elizabeth Strahlstrom for Plaintiffs and Appellants.

Paul B. Campos, James S. Burling and Stephen E. Abraham as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens and Richard M. Frank, Assistant Attorneys General, Peter H. Kaufman and Joseph Barbieri, Deputy Attorneys General, for Defendant and Appellant.

Louise H. Renne, City Attorney (San Francisco), Andrew W. Schwartz, Deputy City Attorney, Johanna H. Wald, John D. Echeverria and Enrico G. Nardone as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**MOSK, J.**—In *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 321 [107 S.Ct. 2378, 2389, 96 L.Ed.2d 250],[1] the court held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which a taking was effective." In so holding, the court cautioned that the holding did not extend to "the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." (*Ibid.*) In the present case, we consider whether a delay in the issuance of a development permit partly owing to the mistaken assertion of jurisdiction by a government agency is a type of "temporary taking" contemplated in *First English*, or if it is more in the nature of a "normal delay" that does not constitute a taking. The Court of Appeal held that a temporary taking had indeed occurred. We conclude that the present case falls squarely into the category of a normal delay rather than a temporary taking, and therefore reverse the Court of Appeal.

I.

Because of the complexities of this case, a somewhat detailed recitation of the facts is in order. The case centers on the efforts of plaintiff Landgate, Inc.,[2] to build a large home in the Malibu Hills. Landgate's predecessor in interest owned two long, thin parcels or "lots" oriented in a north-south direction. The northern portions were sloped, the southern portions flat. One of the lots contained a single-family home on the southern portion. The coast lay to the south of these lots.

In the mid-1980's, the County of Los Angeles (the County) planned to provide an east-west road that would run through the two lots. The landowner and the County agreed that, in exchange for the owner's dedicating portions of the parcels for the roadway easement, the County would reconfigure the lots into a single, sloped 2.45-acre lot north of the road and a single, flat 1.56-acre lot south of the road, each still zoned for a single-family home. The County completed the road improvement, designated as De Butts Terrace, and formally approved a lot reconfiguration, which was recorded July 5, 1989.

The lots in question are, and at all relevant times were, in the coastal zone (Pub. Resources Code, § 30103) and therefore subject to the development

---

[1] The full name of this case is *First English Lutheran Church of Glendale* v. *County of Los Angeles*. We will hereinafter follow the common practice of referring to the case as *First English*.

[2] According to Landgate's first amended complaint, Peter and Punte Bogart "owned and controlled" Landgate and held a life estate in the subject property.

restrictions imposed by the California Coastal Act of 1976 (Coastal Act), Public Resources Code section 30000 et seq. The act requires local governments within the coastal zone to prepare Local Coastal Programs (LCP's) containing a Land Use Plan (LUP) and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and maximizing public access. (Pub. Resources Code, §§ 30001.5, 30512, 30513.) In general, the act provides that, until a certified LCP is approved by the California Coastal Commission (Commission), authority to approve development lies with the Commission. (*Id.*, § 30519.) At the time the pertinent events took place, the Commission had approved the County's LUP for Malibu but had not yet approved the LCP. Therefore, the Commission retained jurisdiction over the issuance of coastal development permits for the area in which the subject property is located.

In October 1990, Landgate bought the sloped northern lot and received County approval in concept for grading and building plans for a single-family home to be built on the property. Landgate applied to the Commission for permits to build the house and related structures. Landgate's permit application sought approval of a 9,036-square-foot home and guest house, a swimming pool and septic tank and 8,500 cubic yards of grading. As originally proposed, the house was 44 feet above existing grade. Before the Commission's initial consideration of the development, Landgate modified its proposal by reducing the house to 7,500 square feet, eliminating the guest house and reducing the proposed grading to 4,300 cubic yards.

At its December 1990 and February 1991 meetings, the Commission was presented with staff reports objecting to several aspects of the project. First, staff was concerned with visual impacts of the house, since it was located next to Escondido Canyon, "a highly scenic area which includes a hiking trail to Escondido Falls. The proposed project is located south and west of Escondido Canyon and is visible from the Escondido Falls Trail and the Escondido Falls." The preservation of scenic and recreational resources of the coastal area is encouraged by both the Coastal Act and the Malibu LUP. (See Pub. Resources Code, § 30251.) Staff concluded that the visual impact of Landgate's proposed development would be significant both because of its location on the lower, northern lot closer to the trail and falls, and because of the 44-foot height, 9 feet above the allowable height contained in the Malibu LUP.

Second, staff found the amount of grading required of the proposed project to be objectionable. "In essence, the applicant is creating a large level pad area on a hillside lot, instead of designing the house to conform with the natural topography." The grading plan was contrary to the Malibu

LUP, which called for the minimization of grading for all new development "to ensure the potential negative effects of runoff and erosion on [visual] resources are minimized." Staff found that these problems would be alleviated if the house was built on the southern side of De Butts Terrace.

These concerns and objections were inextricably linked to staff's third concern, that the Commission had not approved the lot line adjustment obtained from the County by Landgate's predecessor in interest. As noted, prior to the approval of the lot line adjustment, the length of the lots ran in a north to south direction standing side-by-side east to west. If the old lots had remained, then development could have been directed to the more topographically and visually suitable southern portion of the property. Staff further concluded that the lot line adjustment had been illegal. It reached its conclusion as follows: It first observed that section 30106 of the Public Resources Code contains a broad definition of "development" for which a coastal development permit is necessary. " 'Development' means, on land, in or under water, the placement or direction of any solid material or structure; discharge or disposal of any drenched material or any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, *subdivision pursuant to the Subdivision Map Act . . . and any other division of land, including lot splits,* except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use . . . ." (*Ibid.,* italics added.) Staff then cited a 1986 memorandum from the Attorney General circulated to the Commission concluding that "[a] lot line adjustment is a form of a lot split. In some instances, a lot line adjustment may be so minor as to warrant the Commission finding that it is de minimis and qualifies for a waiver pursuant to section 30624.7. In other instances a lot line adjustment may be such that it does bring about a major change in the density or intensity of use of land. In such a case it would fall within the definition of development in section 30106, and would necessarily require a coastal development permit."

The staff report then considered whether the lot line adjustment in question "involves a major change in the density or intensity of land-use." It concluded that while a lot line adjustment did not alter the density of development it would alter its intensity: "The topography north of De Butts Terrace is relatively steep and not suited to development. This proposed project would change the intensity of land-use in this area by allowing development of the north side of the road. . . . Staff believes that the least environmentally damaging site for development is on the coastal [i.e. southern] side of De Butts Terrace and that the original lot configuration of long thin parcels extending across the road should not be altered."

The Commission considered the various issues raised by staff at its December 13, 1990, meeting and voted to continue the matter because of questions concerning the legality of the lot line adjustment. According to the declaration of Landgate's engineer/representative in support of its motion (Petrovsky Declaration), "once the lot line adjustment issue was raised . . . staff would not negotiate with regard to issues of the size of home, grading, etc. Instead, the legality of the lot became the focus of their attention." Landgate reapplied for a coastal development permit proposing the same project as described above, but adding a request for Commission approval of the County lot line adjustment.

At its February 1991 meeting the Commission denied Landgate's application. It adopted staff findings that the proposed house and related structures would produce excessive soil, grading, and visual degradation.[3] Immediately after the vote, Commissioner Glickfeld commented on the County's perceived unwillingness to comply with the Coastal Act: "I really regret the situation that this applicant has been put in because of Los Angeles County's refusal to comply with the Coastal Act and I hope that . . . our staff counsel could be directed to communicate that very clearly with Los Angeles County, bring their response back to us and pursue, if necessary, litigation to insist that the County of Los Angeles comply with the law in this matter." The chief counsel stated that he would prepare a letter to the County.

In March 1991, Landgate filed a petition for writ of mandate against the Commission asserting that the Commission had no jurisdiction over the lot line adjustment. The petition was conjoined with a complaint asserting a taking of property without just compensation and a denial of civil rights, seeking damages and declaratory relief. The mandate petition and takings complaint were severed, with the latter reserved for later adjudication.

Meanwhile, in April 1991, the Commission heard Landgate's request for reconsideration of its project. Grounds for reconsideration of an application exist when "there is relevant new evidence which, in the exercise of reasonable diligence, could not have been presented at the hearing . . . or that an error of fact or law has occurred which has the potential of altering the initial decision." (Pub. Resources Code, § 30627, subd. (b)(3).) At that meeting, Landgate's representative presented a new version of the proposed residence that would be only 32 feet above the existing natural grade, would have

---

[3]According to Commission regulations, a vote by the Commission that is "consistent with [the] staff recommendation and not otherwise modified, . . . shall be deemed to adopt the findings and conclusions recommended by the staff." (Cal. Code Regs., tit. 14, § 13092, subd. (d).) Thus, the Commission, in denying the application consistent with the staff report, is deemed to have adopted the staff's proposed findings discussed above.

1,000 cubic yards of grading, and would make other changes in order to conform the appearance of the house to its natural surroundings. Commission staff opined that the new proposal was more appropriately presented to the Commission as a new project, but did not constitute "new evidence" or "error of fact or law" that would be grounds for reconsidering its February 1991 denial of the project. Staff also told the Commission that "part of the basis for your denial [of the project] was a lot line adjustment and . . . we told them even if they make these modifications we'll still recommend denial." The Commission's legal counsel told the Commission: "Without a lot line adjustment some of these revisions are I think irrelevant." He also stated: "This project does not work, if you please, without that lot line adjustment." He further stated that, in light of the action that Landgate had filed before the request for reconsideration contesting the Commission's jurisdiction over the lot line adjustment, "my advice would be to continue to maintain the position you have maintained before and allow the court system to determine the dispute that presently exists between the Commission and [Landgate] with regard to that." The Commission voted to deny reconsideration.

The above-mentioned litigation proceeded and in October 1991 the trial court granted Landgate's petition for writ of mandate. Specifically, the trial court set aside the Commission's action of February 1991 denying Landgate's application and ordered the Commission to reconsider the application. The court found that, in view of the factual circumstances in this case, the definition of "development" as found in Public Resources Code section 30106 "does not include the lot line adjustment approved and recorded by the County of Los Angeles in 1989 with regard to the subject property. Therefore, upon remand to the Commission, the Commission must consider [Landgate's] application without any reference or consideration of a lot line adjustment. The Commission is to consider the subject property to be a legal lot." The court did not order the approval of any particular development proposal.

The Court of Appeal affirmed the trial court in an unpublished decision in December 1992. In arriving at its conclusion, the court found significant the fact that Landgate had purchased a lot that had been approved by the County and had been recorded, that the Commission had approved the construction of the road, De Butts Terrace, that made the then existing lot configuration impractical and necessitated the lot line adjustment, and that the Commission's position with respect to the lot line adjustment would render Landgate's property valueless. In essence, it held that Public Resources Code section 30106 did not authorize the Commission to invalidate a legally recorded lot line adjustment to which the Commission, by its actions and

inaction, had given tacit approval, when an innocent purchaser would stand to lose all value from its lot from such invalidation. The court also questioned the Commission's assertion that any building on Landgate's lot was inconsistent with the Coastal Act, citing other development north of De Butts Terrace that the Commission had approved. In its conclusion, it emphasized that the Commission "retained its ability to regulate and approve any proposed building on the lot."

In February 1993, the Commission again considered Landgate's project, which had been modified by reducing grading to 2,893 cubic square yards, by reducing height to 35 feet above existing grade, and by reducing the fill slope, among other changes. It required further changes in the project to address the visual impacts and erosion problems that it had earlier found to be objectionable. Specifically, it imposed a height limitation of 28 feet above existing grade on the proposed residence, and required a drainage plan as well as color restrictions and landscape requirements consistent with the scenic preservation with which the Commission was concerned. Landgate did not challenge these conditions.

Subsequently, Landgate moved for summary adjudication of its still-unresolved takings claim. It contended that the Commission's erroneous assertion of permit jurisdiction over the lot line adjustment prevented it from making any economically viable use of its property for the period prior to the Commission's approval of its project in February 1993. The Commission moved for summary judgment, contending that its jurisdictional error did not constitute a taking of Landgate's property. The trial court granted Landgate's motion, ruling that the Commission had temporarily taken Landgate's property from February 1991 to February 1993. In its statement of decision, the trial court declared that "Landgate's third cause of action for taking of property without just compensation . . . is meritorious as a matter of law . . . because Landgate has been deprived, at least temporarily, of all economically viable or productive use of its property insofar as Landgate, at least temporarily, could not legally obtain any valid permits or approvals to construct any project on its property as a result of the Commission's actions." The trial court also denied the Commission's motion for summary judgment. After a bench trial on the issue of damages, the trial court awarded takings damages of $155,657 for the period between February 1991 and February 1993. The Commission appealed the grant of summary adjudication and the award of attorney fees. Landgate filed an appeal contesting the amount of damages and filed a separate notice of appeal from the trial court's award of costs and attorney fees.

The Court of Appeal affirmed the trial court's grant of summary adjudication in Landgate's favor. It appeared to accept the Commission's assertion

that reasonable mistakes made by a government agency in the development approval process do not necessarily constitute takings. But, as it stated: "[W]hat we cannot accept is the Commission's characterization of the treatment of Landgate here as the reasonable result of a 'mistake.' Nothing in the record suggests that the lot line adjustment issue arose out of anything other than the Commission's ongoing jurisdictional spat with the County of Los Angeles combined with a desire to prevent Landgate from building on its parcel. Instead, the overwhelming sense of the record is that by its insistence that the lot itself was illegal, the Commission put Landgate in a situation which was not of its own making and which Landgate could do nothing to cure. In short, this is not a case of bureaucratic bungling, but the declaration of war between governmental behemoths in which the inevitable casualty was to be a noncombatant, Landgate." It also affirmed the trial court's award of damages. We granted review to address the important question of whether the Commission's apparently mistaken assertion of jurisdiction of the lot line adjustment in this case led to a temporary taking of Landgate's property.[4]

## II.

### A.

■ Before addressing the present issue, we briefly summarize pertinent takings jurisprudence. In determining whether a government regulation works a taking of property under the Fifth Amendment to the United States Constitution, the United States Supreme Court has generally eschewed any "set formula" for determining how far is too far, preferring to engage in " 'essentially ad hoc, factual inquiries.' " (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798] (*Lucas*).) The court has stated that the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations." (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [98 S.Ct. 2646, 2659, 57 L.Ed.2d 631].) The court has also stated that "the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests.' " (*Lucas, supra*, 505 U.S. at p. 1016 [112 S.Ct. at p. 2894.) The court has furthermore described "at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint. The first encompasses regulations that compel the

---

[4]We note at the outset that this case comes to us after a grant of Landgate's summary adjudication motion on its claim that its property was taken without just compensation and a denial of the Commission's motion for summary judgment. Thus, we undertake independent review of the record to determine whether a triable issue of fact exists as to the takings claim. (*Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973, fn. 7 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

property owner to suffer a physical 'invasion' of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation. . . . [¶] The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." (*Id.* at p. 1015 [112 S.Ct. at p. 2893].)

In *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 275 [157 Cal.Rptr. 372, 598 P.2d 25], we had held that the sole remedy for government regulation that effects a taking of property is an administrative mandamus overturning the regulation rather than an award of damages. That holding was repudiated by the United States Supreme Court in *First English*, *supra*, 482 U.S. 304. In *First English*, the plaintiff operated a campground on which lay a number of buildings that had been destroyed by flood. An interim Los Angeles County ordinance prohibited construction or reconstruction of any building or structure in an interim flood protection area that included the plaintiff's land. ■ The court assumed for purposes of the appeal that the ordinance deprived the plaintiff of all economically beneficial use of its property. It then held that such deprivation constituted a temporary taking of the property for which compensation must be paid. " '[T]emporary' takings which . . . deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." (*Id.* at p. 318 [107 S.Ct. at p. 2388].) Thus, the court held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." (*Id.* at p. 321 [107 S.Ct. at p. 2389].)

The *First English* court emphasized the narrowness of its holding. "We . . . point out that the allegation of the complaint which we treat as true for purposes of our decision was that the ordinance in question denied appellant all use of its property. We limit our holding to the facts presented, and of course do not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." (*First English*, *supra*, 482 U.S. at p. 321 [107 S.Ct. at p. 2389].)

Consistent with this implied limitation on the temporary takings doctrine, the United States Supreme Court has also "made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. [Citation.] The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her

property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired." (*United States* v. *Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126-127 [106 S.Ct. 455, 459, 88 L.Ed.2d 419].) Stated in other terms, whereas "the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' " (*First English, supra,* 482 U.S. at pp. 318-319 [107 S.Ct. at p. 2388], fn. omitted), a rational permit regulation scheme is imposed on the public as a whole to ensure the orderly development of real property, benefiting as well as burdening property owners.

■ Finally, the Supreme Court has emphasized that the question whether property has been taken is not ripe for decision until a government agency has rendered a final decision on the use to which the property in question may be put. "Our reluctance to examine taking claims until . . . a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although '[t]he question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty' [citation], this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. [Citations.] Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." (*Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 190-191 [105 S.Ct. 3108, 3118-3119, 87 L.Ed.2d 126]; see also *MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348 [106 S.Ct. 2561, 2565-2566, 91 L.Ed.2d 285].)

B.

■ The present case poses the issue of whether a legally erroneous decision of a government agency during the development approval process resulting in delay constitutes a temporary taking of property. Virtually every court that has examined the issue has concluded, for various reasons and under various theories, that a regulatory mistake resulting in delay does *not*, by itself, amount to a taking of property. (See *Littoral Development Co.* v. *San Francisco Bay Conservation etc. Com.* (1995) 33 Cal.App.4th 211, 221-222 [39 Cal.Rptr.2d 266] (*Littoral Development Co.*); *Del Oro Hills* v. *City of Oceanside* (1995) 31 Cal.App.4th 1060, 1080 [37 Cal.Rptr.2d 677]; *Jacobi* v. *City of Miami Beach* (Fla.Dist.Ct.App. 1996) 678 So.2d 1365,

1367; *Cannone* v. *Noey* (Alaska 1994) 867 P. 2d 797, 801; *Dumont* v. *Town of Wolfeboro* (1993) 137 N.H. 1 [622 A.2d 1238, 1244]; *Tabb Lakes, Ltd.* v. *U.S.* (Fed. Cir. 1993) 10 F.3d 796, 801-802; *Steinbergh* v. *City of Cambridge* (1992) 413 Mass. 736 [604 N.E.2d 1269, 1274-1277]; *Smith* v. *Town of Wolfeboro* (1992) 136 N.H. 337 [615 A.2d 1252, 1257-1258]; *1902 Atlantic Ltd.* v. *U.S.* (1992) 26 Cl.Ct. 575; *Lujan Home Builders* v. *Orangetown* (1991) 150 Misc.2d 547 [568 N.Y.S.2d 850, 851].)

In *Steinbergh* v. *City of Cambridge*, *supra*, 604 N.E.2d 1269 (*Steinbergh*), for example, the Supreme Judicial Court of Massachusetts considered the claim of a landlord suing the city for takings damages stemming from a city regulation that restricted the conversion of rental units into condominiums. The court had, in a previous decision, declared that the regulation exceeded the city's statutory authority under the state's rent control statute and was therefore invalid. The plaintiff claimed that he suffered damages from the decline in the condominium market during the period of the delay that resulted from the necessity of mounting a legal challenge to the invalid rent regulation. The court first concluded that the regulation in question was neither a physical invasion of property nor a deprivation of all viable use, nor a substantial interference with the property owner's distinct investment-based expectations. (See *id*. at p. 1274.) The court likened the delay experienced in the case to delay "that commonly occurs in seeking regulatory approvals for changes in local ordinances and by-laws, which are government-imposed processes that have not traditionally been viewed as constituting regulatory takings." (*Id*. at p. 1275.) "It is, of course, true that in this case the delay was caused, not by the necessity of obtaining mandated governmental approvals, but by the process of presenting a judicial challenge to a municipal regulation. That legal challenge resulted in invalidation of the regulation as beyond the authority of the city to adopt, but not because the municipal regulation was unconstitutional as violating rights to due process or equal protection of the laws. [Citation.] The plaintiffs make no reasoned argument that, simply because a municipal regulation is not authorized by law, there is a compensable temporary taking of property, even though the regulation restricts the sale and reduces the market value of the property until the regulation is successfully challenged in court." (*Ibid*.)

The *Steinbergh* court then considered the argument that the invalidated regulation did not " 'substantially advance legitimate state interests' " and therefore was a taking of property under the test articulated by the Supreme Court. (*Steinbergh*, *supra*, 604 N.E.2d at p. 1275, quoting *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].) Although it had found in its previous decision that the condominium conversion regulation was insufficiently connected with rent control, and therefore

not impliedly authorized by the state rent control statute, it rejected the argument that this state law defect translated into a constitutional flaw. It found that the regulation was "a 'logical and sufficiently well-founded approach to dealing' with a problem [of removal of rental units from the market] for us to find . . . that the 'essential nexus' between 'the State's interest and its chosen means is present in this case.' " (*Steinbergh, supra,* 604 N.E.2d at p. 1277.) Therefore, despite the invalidity of the regulation, it concluded that the plaintiffs had not met their constitutional burden of demonstrating that the regulation failed to substantially advance a legitimate state interest.

Our own Court of Appeal has reached a similar conclusion. (See *Del Oro Hills* v. *City of Oceanside, supra,* 31 Cal.App.4th 1060, 1080; *Littoral Development Co., supra,* 33 Cal.App.4th 211.) In *Littoral Development Co.,* the Court of Appeal considered a regulatory taking claim against the San Francisco Bay Conservation and Development Commission (BCDC). It had decided in a previous decision that BCDC, which was given jurisdiction over development of property adjacent to San Francisco Bay subject to "tidal action" (Gov. Code, § 66610, subd. (a)), had incorrectly asserted jurisdiction over the landward two-thirds of the plaintiff's property in Marin County, thereby delaying the construction of a hotel on that property. It had accordingly reversed the trial court's decision upholding that jurisdiction. Nonetheless, it rejected the takings claim, stating: "Under the circumstances, we cannot find any regulatory 'taking' of any property, merely because delay resulted from factual or legal uncertainties which temporarily clouded the respective limits of BCDC's and Marin County's regulatory jurisdiction. . . . [¶] While we recognize that, on very different facts, a transient and impermanent interference in real property use due to egregious bureaucratic overreaching may arguably constitute a compensable temporary taking, BCDC's actions here were facially valid and supported by a plausible though erroneous legal argument which the trial court accepted. We decline to hold that such a taking occurred here or occurs every time a land-use agency makes an erroneous decision which is ultimately overturned in part on appeal." (*Littoral Development Co., supra,* 33 Cal.App.4th at pp. 221-222.) It also found significant that the plaintiff still had some unspecified use of the property during the pendency of legal proceedings. (*Ibid.*)

We substantially agree with the Supreme Judicial Court of Massachusetts, with our Court of Appeal, and with the other courts cited above that an error by a governmental agency in the development approval process does not necessarily amount to a taking even if the error in some way diminishes the value of the subject property, any more than the commission of state law error during a criminal trial is an automatic violation of the due process

clause. (See, e.g., *Estelle* v. *Maguire* (1991) 502 U.S. 62, 71-73 [112 S.Ct. 475, 481-483, 116 L.Ed.2d 385]; *People* v. *Carpenter* (1997) 15 Cal.4th 312, 393 [63 Cal.Rptr.2d 1, 935 P.2d 708].) If the error is of a particular constitutional type—the passage and enforcement of a law or regulation that deprives property of all value—then the teaching of *First English* is that such an error is a compensable taking. But government land use regulations and decisions such as those cited above in *Steinbergh* and *Littoral Development Co.*, which, despite their ultimately determined statutory defects, are part of a reasonable regulatory process designed to advance legitimate government interests, are not takings of property under the Supreme Court's doctrine reviewed above. (See *Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].)

■ An analogous situation may be found when the government initiates condemnation proceedings against an undeveloped tract of land, thereby bringing the development process to a standstill. We have held that when a government agency later abandoned such proceedings, it was not liable under the takings clause, even when the proceedings caused substantial delay in the development approval process and led to losses in the property's value. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d at pp. 271, 277-278 [eminent domain proceeding active for almost one year before abandonment].) The United States Supreme Court affirmed this aspect of our *Agins* decision, agreeing that we had "correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. [Citation.] Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property *when the proceedings ended.* Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' " (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 263, fn. 9 [100 S.Ct. at p. 2143], italics added.) Just as an aborted condemnation proceeding that delays development is an incident of ownership and not a taking, so the mistaken assertion of jurisdiction over a development is part of the development approval process, and development delays that result therefrom may be imposed on the developer rather than the general taxpayer without violating the United States Constitution.[5]

■ The Court of Appeal did not hold that all governmental mistakes in the land use process amounted to takings. The Court of Appeal held rather,

---

[5]The principle that a government agency will not be liable in damages for state law errors committed in the development approval process is congruent with Government Code section 818.4, which provides that a public entity cannot be held liable "for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny,

as noted above, that the Commission's February 1991 decision to deny Landgate's development application and its position on the lot line issue was not the "reasonable result of a 'mistake'" but rather arose out of a "jurisdictional spat with the County of Los Angeles combined with a desire to prevent Landgate from building on its parcel," and a "declaration of war between governmental behemoths in which the inevitable casualty was to be a noncombatant, Landgate."

The Court of Appeal erred in its attempt to divine, through the statements of commissioners and Commission staff and through circumstantial evidence, the "true," illegitimate, motive for the Commission's decision to deny Landgate's development permit. The proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter. (See *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 836-837 [107 S.Ct. 3141, 3148-3149, 97 L.Ed.2d 677] (*Nollan*); *Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 391 [114 S.Ct. 2309, 2319-2320, 129 L.Ed.2d 304] (*Dolan*).) This type of objective inquiry is consistent with the principle that courts do not delve into the individual purposes of decisionmakers in a quasi-adjudicative proceeding, but rather look to the findings made by the government agency and determine whether these are based on substantial evidence. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 779 [122 Cal.Rptr. 543, 537 P.2d 375]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515-516 [113 Cal.Rptr. 836, 522 P.2d 12]; see also *United States* v. *Morgan* (1941) 313 U.S. 409, 422 [61 S.Ct. 999, 1004-1005, 85 L.Ed. 1429].) Thus, we must determine not whether a sinister purpose lurked behind the Commission's decision, but rather whether the development restrictions imposed on the subject property substantially advanced some legitimate state purposes so as to justify the denial of the development permit.

 Moreover, the cases suggest that judicial review of governmental conditions imposed upon development will be more deferential when the conditions are simply restrictions on land use and not requirements that the property owner convey a portion of his property (see *Nollan, supra,* 483 U.S. at p. 841 [107 S.Ct. at pp. 3150-3151]; *Dolan, supra,* 512 U.S. at pp. 388-391 [114 S.Ct. at pp. 2318-2320]) or pay development fees imposed on a property owner on an individual and discretionary basis (*Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 876 [50 Cal.Rptr.2d 242, 911 P.2d

---

suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or an employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked."

429]). ▇▇▇ In the present case, neither conveyances nor individualized development fees are at issue.

The Commission's denial of Landgate's permit in February 1991 did indeed appear to substantially advance legitimate governmental interests and to be supported by substantial evidence. The Commission's findings articulated three objections to the project as proposed. First, the Commission was concerned that the large house, 44 feet above natural grade and 9 feet above the maximum allowable height set forth in the Malibu LUP, would be unsightly when viewed from Escondido Trail and Escondido Falls. Second, the Commission was concerned that excessive grading on the north slope, where the house was to be built, was contrary to the Malibu LUP, which called for the minimization of grading for all new development, "to ensure the potential negative effects of runoff and erosion on [visual] resources are minimized." These are unquestionably legitimate government purposes (see *Ehrlich* v. *City of Culver City, supra*, 12 Cal.4th at p. 886 [promotion of scenic and aesthetic objectives within the scope of the police power]) and there is substantial evidence in the record in support of the reasonableness of the Commission's position. Indeed, Landgate does not challenge the conditions ultimately imposed by the Commission requiring the reduction of building height and total amount of grading.

The third Commission objection, the improper lot line adjustment, was principally based not on formal, jurisdictional or bureaucratic grounds, but on the view that such adjustment would lead to an intensification of the environmental impacts with which the Commission was concerned. Based on our review of the record, as discussed above, the Commission's position appears reasonable and supported by substantial evidence. It found that the placement of the house on the north slope would make it more unsightly, bringing it closer to Escondido Trail and Escondido Falls, and would also obviously increase the need for grading—and with it the potential for erosion—in order to create a flat pad for the proposed residence on a sloping surface. The Commission's preference for construction on the flat south side of De Butts Terrace was therefore reasonable. In sum, the denial of a development permit in February 1991 on the three enumerated grounds advanced legitimate governmental interests in minimizing erosion and unsightly development in the coastal area.

We do not agree with the Court of Appeal that anything in the record establishes that the Commission was motivated in its decisions by a "jurisdictional spat" with the County. The Court of Appeal quotes the statement made by one of the commissioners after denial of the application that "the county's refusal to recognize our right to review lot line adjustments" was

"an issue that had come before the Commission many times in the Malibu area." She added that it was "really time to become extremely serious about this" and asked that staff counsel be directed to communicate with the County on the topic. But the fact that the commissioner expressed frustration over the County's failure to recognize the Commission's jurisdiction does not suggest that the primary or even secondary reason for the Commission's vote was to teach the County some sort of jurisdictional lesson.

Nor are we persuaded by the Court of Appeal's conclusion that the Commission's decision must not have been based on legitimate environmental concerns because it "could have imposed special conditions on matters such as height in February 1991, but failed to issue the permit until after the lot line question was resolved in February 1993." From the Commission's point of view, the environmental impacts of the project could have been reduced if the original lot line configuration was maintained. Once the Commission was confronted by a court ruling that made restoration of the original configuration impossible, it settled for what it regarded as the next best alternative: permitting development on the north side of De Butts Terrace, but with conditions imposed to reduce these environmental impacts. There is therefore no inconsistency between the Commission's environmental concerns and the respective positions it adopted throughout the development approval process.

The Court of Appeal also concluded that since the Commission may have approved or was going to approve two homes on the same sloping north side as Landgate's parcel, "those approvals are clear indications that but for the lot line adjustment, Landgate's application to build a house and related structures on its property could and would, through the normal negotiation process, have been approved by February 1991 or shortly thereafter." But it is clear that the Commission had a policy to concentrate development in the area on the flat south side of De Butts Terrace. The fact that there may have been exceptions to this policy, based on considerations particular to these specific projects, for reasons not present in the current administrative record and about which we can only speculate, does not negate the fact that the Commission had a rational policy preference for concentrating development on the south side of De Butts Terrace.

It would be, of course, a different question if, even though the Commission's position on the lot line adjustment substantially advanced a legitimate state interest, that position was so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it. Such a delaying tactic would not advance any valid government objective. Here, however, as discussed, the Commission's

position on the lot line adjustment issue was based on a construction of Public Resources Code section 30106 and the meaning of the term "development" contained therein that was not unreasonable. As discussed, that section defines development over which the Commission will have jurisdiction broadly to include "change in the density or intensity of use of land, including, but not limited to, . . . lot splits." Without deciding questions not before us,[6] the Commission's conclusion, following the Attorney General's advice, that section 30106 gave it authority to deny the lot line adjustment was "supported by a plausible though [perhaps] erroneous legal argument" and therefore not the basis of a taking. (*Littoral Development Co., supra,* 33 Cal.App.4th at p. 221.)

Indeed, the Court of Appeal's earlier decision on the lot line issue was based not on the Commission's general lack of authority over such issues, or even on the fact that invalidation of the lot line would deprive Landgate of property, but rather on the court's determination that the Commission's earlier course of conduct had constituted a kind of acquiescence to the lot line adjustment. Although the Court of Appeal may have been correct on that point, and the Commission mistaken given the peculiar facts of this case, its position was not so objectively unreasonable as to give rise to the inference that it was adopting that position solely for purposes of delay or some other illegitimate reason.

## C.

Landgate's argument that the Commission temporarily took its property rests on somewhat different grounds than those on which the Court of Appeal holding was based. Landgate argues that regardless of whether the Commission's lot line adjustment condition substantially advanced a legitimate state interest, the imposition of such condition was nonetheless a taking because it temporarily deprived Landgate's property of all value. Landgate contends that from the time the development permit was denied in February 1991 until the time it was approved in February 1993 after the lot line issue had been resolved by litigation, the development process was at a standstill, effectively depriving the property of all economic benefit. Landgate cites the Petrovsky Declaration, discussed above, as evidence that the Commission refused to continue negotiation with Landgate as long as the jurisdictional dispute over the lot line adjustment was pending. Landgate argues that the Commission's actions amount to a denial of all economically beneficial use

---

[6]The Court of Appeal's prior, unpublished decision regarding the lot line issue is now final and may not be relitigated. (See *Kavanau* v. *Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 779 [66 Cal.Rptr.2d 672, 941 P.2d 851].) We do not necessarily endorse that decision, nor are we bound by its reasoning. (*Id.* at pp. 777-779.)

of the land and thus is a categorical taking (*Lucas, supra*, 505 U.S. at p. 1016 [112 S.Ct. at pp. 2893-2894]) even if only temporary. (*First English, supra*, 482 U.S. at p. 320 [107 S.Ct. at pp. 2388-2389].)

Of course, each time there is a delay in the development process, the delay may be said to temporarily deprive the developer of undeveloped property of use of that property. From the would-be developer's point of view, the impact of ordinary delay due to a governmental mistake on the one hand, and denial of all feasible use on the other, may be identical. But as discussed above, for purposes of the takings doctrine the two types of governmental action are quite different. (See *First English, supra*, 482 U.S. at p. 321 [107 S.Ct. at pp. 2389-2390].)

Landgate asserts, however, that what is at issue in this case was not a normal development delay due to the Commission's mistake, but in fact a final Commission decision to ban all development of Landgate's property, a position the Commission was forced to abandon only because it lost on the jurisdictional question. More specifically, Landgate contends the Commission's position that the former lot lines be preserved, combined with its insistence that no development take place north of De Butts Terrace, rendered Landgate's lot valueless, because its lot was situated wholly to the north of De Butts Terrace. To state the argument differently, if, for example, a municipality's ordinance denies a parcel of real property all economically feasible use, it would arguably be no defense to a temporary takings claim to show that the ordinance was eventually invalidated for being inconsistent with the municipality's general plan.[7] Similarly, Landgate contends in effect that its failure to make progress toward developing its property between February 1991 and February 1993 was due not to an interim uncertainty created by the jurisdictional dispute with the Commission, but to a decision

[7]The Commission and some of its amici curiae argue that a government exercise of power that is beyond its jurisdictional authority can *never* be a taking. The argument is based on the principle that the takings clause only authorizes compensation for "a taking of private property for *public* use," and that when a government's action is ultra vires because the agency has exceeded its statutory authority, it cannot as a matter of law be said to have taken property for public use. Some federal courts appear to accept this rationale, holding that the Tucker Act (28 U.S.C. § 1491), creating a statutory procedure by which those who have had their property taken by the United States Government may file a claim for compensation, does not cover " 'an executive taking not authorized by Congress, expressly or by implication.' [Citations.] ('[B]efore a compensable taking can be found by the court, there must be some congressional authorization, expressed or implied, for the particular taking claimed.') Thus, claimant must concede the validity of the government action which is the basis of the takings claim to bring suit under the Tucker Act . . . ." (*Tabb Lakes, Ltd.* v. *U.S., supra*, 10 F.3d at pp. 802-803.) Because we decide the issue on other grounds, we do not decide the question whether the action of a government agency that exceeds its statutory authority can ever be a compensable taking.

by the Commission in February 1991, and subsequently, to deny all economically feasible use of Landgate's property, a denial that was the administrative equivalent of an ordinance banning all development on the subject property, such as was found in *First English.*

In considering whether the Commission's actions constituted in fact a denial of all economically feasible use, we first note that the Supreme Court has characterized the circumstances under which a categorical taking occurs under these circumstances as "extraordinary" and "relatively rare." (*Lucas, supra*, 505 U.S. at pp. 1017, 1018 [112 S.Ct. at pp. 2894, 2894-2895].) In *Lucas*, for example, the court was confronted with South Carolina's Beachfront Management Act, which authorized a government agency to establish a coastal zone in which no development could occur, and which "had the direct effect of barring [the property owner] from erecting any permanent habitable structures on his two parcels." (*Id.* at p. 1007 [112 S.Ct. at p. 2889].) The property owner bears the burden of showing that the government action in question denied it economically beneficial use of its land. (*Id.* at p. 1016, fn. 6 [112 S.Ct. at pp. 2893-2894].)[8]

Landgate ignores the critical difference between this case and *Lucas* and *First English*. An understanding of this difference begins with the principle that "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." (*United States* v. *Riverside Bayview Homes, Inc., supra*, 474 U.S. at p. 126 [106 S.Ct. at p. 459].) Part of that regulatory process is the imposition of certain procedural conditions and substantive requirements on development. These conditions can include such matters as the filing of a proper subdivision map (Gov. Code, § 66426), installation of proper sewer facilities (*id.*, § 66483), or the requirement that the development undergo the process mandated by the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). A necessary corollary of the above quoted principle is that a government agency may deny a development permit when the reasonable conditions imposed on development are not met without that denial constituting a taking. As the United States Supreme Court has stated, an essential prerequisite to the assertion of a takings claim is "a final and authoritative determination of the type and intensity of development legally permitted on the subject property." (*MacDonald, Sommer & Frates* v. *Yolo County, supra*, 477 U.S. at p. 348 [106 S.Ct. at p. 2566].) If a would-be developer fails to meet legitimate conditions for obtaining a development permit, then a

---

[8]We also note that in *First English* on remand, the Court of Appeal held that no taking of property had resulted because the owner was still permitted significant use. (*First English Evangelical Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353, 1372 [258 Cal.Rptr. 893].)

government agency's refusal to issue such a permit would by no means be a "final and authoritative determination of the intensity of development legally permitted on the subject property," but merely a conditional denial. And, as reviewed in the preceding part of this opinion, the imposition of a development condition is not a constitutional violation merely because that condition is subsequently shown to have been erroneously imposed.

In California, one of the conditions of obtaining a permit for development within the coastal zone is the procurement of a coastal permit. The Commission's authority to approve development is concurrent with the authority of local jurisdictions, and thus compliance with the Subdivision Map Act does not excuse compliance with the Coastal Act. (See Pub. Resources Code, § 30106; see also *South Central Coastal Regional Com.* v. *Charles A. Pratt Construction Co.* (1982) 128 Cal.App.3d 830, 844-846 [180 Cal.Rptr. 555].) This approval requirement extends to "any . . . division of land" that affects the density or intensity of development. (Pub. Resources Code, § 30106.) As discussed, Landgate's development was denied because of the Commission's plausible, though perhaps legally erroneous, position that Landgate or its predecessor failed to comply with one of the conditions of obtaining a coastal development permit by illegally reconfiguring the lot boundaries. Its rejection of Landgate's development was at most conditional—nothing in the record suggests that the Commission would have denied a development that fell within legally recognized, and environmentally more favorable, boundaries.

The nature of the Commission's actions comes into clearer focus if we alter the facts of this case slightly. Suppose the original owner of two lots that ran lengthwise in a north to south direction, east and west of each other, which we will designate as lots A and B, decided to reconfigure the lots into two lots running lengthwise east to west, north and south of each other, lots C and D. The owner submitted development plans for lot C, but the Commission denied development because in its view such a lot did not legally exist, and because to recognize such a lot would have certain detrimental environmental consequences. This decision cannot be fairly characterized as a deprivation of all value of lot C, but simply as a refusal to reconfigure lots A and B. Even if it turned out that the Commission had incorrectly asserted its jurisdiction, it would have committed the state law error of improperly refusing to reconfigure lots A and B, not the constitutional one of denying development on lot C. Or to put it another way, the Commission's denial of development on lot C is not a final decision on that development until the dispute over whether lot C legally existed was resolved. Just as the denial of a permit for failing to properly submit to the CEQA process would not be a taking, even if the government's application

of CEQA regulations prove to be flawed (see Pub. Resources Code, § 21168.9 [writ of mandate the sole remedy for violations public agency noncompliance with CEQA]), so the denial of development due to a determination, subsequently held to be erroneous, that the development did not conform to the property's legal boundary is not a taking.

The present case differs from the above hypothetical in that "lot C" was sold to a subsequent purchaser rather than kept by the original owner. But it cannot be the case that this subsequent purchase had a constitutional significance, converting the Commission's assertion of its regulatory jurisdiction to approve lot reconfigurations into a taking of property.[9]

The present case also differs from the hypothetical because a road was built through lots A and B, thereby supporting Landgate's argument that even if the Commission had jurisdiction over a lot line adjustment, it had implicitly waived its right to deny that adjustment by acquiescing in construction of the road. But the existence of the road, while it may have been grounds for finding that the Commission erred in failing to recognize the legal existence of "lot C," did not convert the Commission's state law error into a taking. Again, the Commission could legitimately require that a lot on which development was requested be legal, when, as here, there are legitimate reasons for so requiring. Therefore, when the Commission determined that Landgate's lot was not legal, it could legitimately litigate the lot line question without offending the takings clause. The Commission could not be said to have reached a final and authoritative determination of the development on Landgate's lot until after the dispute about the legality of the lot had been resolved.

Of course, as explained in the preceding part of this opinion, a government agency may not evade the takings clause by fabricating a dispute over the legality of a lot, or by otherwise arbitrarily imposing conditions on development in order to delay or discourage that development. The government agency's assertion of authority, whether or not erroneous, must advance some legitimate government purpose. But as discussed above, the Commission's actions in this case met this constitutional prerequisite.

In light of the foregoing, the difference between this case and *First English* becomes clear. Here, there was a postponement of development

---

[9]We note that the innocent purchaser of an illegal lot is not left without a remedy. There may well be private remedies available. (See, e.g., *Goodspeed* v. *Associated Almond Growers* (1929) 208 Cal. 121, 122 [280 P. 530] [sale of a parcel in violation of the Subdivision Map Act may be rescinded].) The innocent purchaser of an illegal lot may also have the options of negotiating with other private landowners to obtain a legal lot, and negotiating with the government agency to develop the property in such a way as to meet the agency's underlying concerns. Because Landgate's lot was ultimately judged to be legal, we do not know, and need not determine, which of these options Landgate could have pursued.

pending resolution of a threshold issue of the development approval process —whether the lot was legal—and not a final decision denying development. In *First English*, on the other hand, the Supreme Court assumed that the ordinance in question categorically denied all property owners within its purview the right to develop their property. Development was assumed to be denied in *First English*, in other words, even though there was no dispute about a threshold issue in the development approval process, as there was in this case, that would be a legitimate basis for postponing approval of development. The postponement of Landgate's development therefore does not constitute a temporary taking of property as that doctrine was conceived in *First English*.

Landgate indeed appears to argue that any impasse in the regulatory process that must be resolved through a judicial proceeding is a temporary taking rather than a normal delay in development. But *First English* merely stands for the proposition that once a government action finally denies all economically viable use of property, the fact that the government later rescinds that action after a judicial proceeding does not relieve it of its duty to pay compensation. (*First English, supra,* 482 U.S. at p. 321 [107 S.Ct. at p. 2389].) Nothing in *First English*, however, is inconsistent with the recognition that a judicial determination of the validity of certain *preconditions to development* is a normal part of the development process, and the fact that a developer must resort to such a determination does not constitute a per se temporary taking.

In fact, a review of our case law reveals numerous instances in which developers have sought a writ of mandate against public agencies over questions regarding lot configuration, compliance with the Subdivision Map Act, compliance with CEQA, and over other threshold questions that must be resolved before it can be determined whether a development should be permitted to proceed. The resolution of these cases often turns on the construction and application of complex statutory schemes and results in significant delays in the development process. In some cases, the developer succeeded in overturning the public agency's decision on these threshold development questions. (See, e.g., *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143] [county misconstrues its authority to merge parcels of land under Gov. Code, § 66410 et seq.]; *Lakeview Meadows Ranch* v. *County of Santa Clara* (1994) 27 Cal.App.4th 593 [32 Cal.Rptr.2d 615] [county wrongly denies certificate of compliance with Subdivision Map Act pursuant to Gov. Code, § 66499.35 for parcels created prior to 1893]; *Native Sun/Lyon Communities* v. *City of Escondido* (1993) 15 Cal.App.4th 892, 911 [19 Cal.Rptr.2d 344] [city misapplies Gov. Code, § 66452.6 in failing to extend subdivision map due to

development moratorium]; *San Dieguito Partnership* v. *City of San Diego* (1992) 7 Cal.App.4th 748 [9 Cal.Rptr.2d 440] [city misapplies Gov. Code, § 66412 in requiring particular lot line adjustment to comply with Subdivision Map Act]; *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359] [city misconstrues Subdivision Map Act to permit discretion in approving final subdivision map when all the conditions of the tentative map have been met].) In other instances, the courts have upheld the government's position on these threshold development questions. (See, e.g., *Gomes* v. *County of Mendocino* (1995) 37 Cal.App.4th 977 [44 Cal.Rptr.2d 93] [county had properly applied Gov. Code, § 66499.20½ in determining underlying land patents had been eliminated by subsequent subdivision]; *Harroman Co.* v. *Town of Tiburon* (1991) 235 Cal.App.3d 388 [1 Cal.Rptr.2d 72] [town's downzoning of plaintiff's property inconsistent with present general plan but consistent with new draft general plan affirmed pursuant to Gov. Code, § 65589.5]; *John Taft Corp.* v. *Advisory Agency* (1984) 161 Cal.App.3d 749 [207 Cal.Rptr. 840] [county's determination that parcels recognized by a United States Government Survey Map in 1878 not exempted from Subdivision Map Act upheld]; *South Central Coast Regional Com.* v. *Charles A. Pratt Construction Co.*, *supra*, 128 Cal.App.3d 830 [developer obtaining tentative subdivision map prior to enactment of Coastal Act not exempted from Act's requirements]; *Bel Mar Estates* v. *California Coastal Com.* (1981) 115 Cal.App.3d 936 [171 Cal.Rptr. 773] [Commission correctly construed statutory authority to deny development]; *Scrogings* v. *Kovatch* (1976) 64 Cal.App.3d 54 [134 Cal.Rptr. 217] [county properly exercises authority under Subdivision Map Act to deny further lot splits before installation of public sewer system].)

Landgate does not appear to contend that litigation over threshold development questions is a taking of property if the government agency prevails in such litigation. But to conclude that such litigation is a normal part of the regulatory process when the public agency prevails but a per se temporary taking when the public agency loses has no basis in either logic or Supreme Court precedent.

In sum, Landgate has not demonstrated that the development delay between February 1991 and February 1993 was due to anything other than a bona fide dispute over the legality of Landgate's lot and the Commission's jurisdictional authority over the lot line adjustment. Such delay is an incident of property ownership and not a taking of property. (See *Agins* v. *Tiburon*, *supra*, 447 U.S. at p. 263, fn. 9 [100 S.Ct. at p. 2143].) Although Landgate was in the unfortunate position of suffering from a delay not of its own making, the same can be said of any governmental mistake or, for that matter, any of a number of possible bottlenecks in the development process.

(See, e.g., *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] [development postponed several years due to association's litigation regarding the adequacy of the environmental impact report]); *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161] [same]; *Friends of La Vina* v. *County of Los Angeles* (1991) 232 Cal.App.3d 1446 [284 Cal.Rptr. 171] [same].) Because nothing in the record demonstrates that the Commission's actions amounted to a regulatory taking of Landgate's property, the trial court should have granted its motion for summary judgment on Landgate's taking claim, and should have denied Landgate's motion for summary adjudication.

## III

For all the foregoing reasons, the judgment of the Court of Appeal is reversed and the cause is remanded to the Court of Appeal. The Court of Appeal shall remand to the trial court with directions to grant the Commission's motion for summary judgment against Landgate's takings claim and to deny Landgate's motion for summary adjudication.

George, C. J., Kennard, J., and Werdegar, J., concurred.

**CHIN, J.,** Dissenting.—The takings clause of the federal Constitution guarantees property owners "just compensation" when their property is "taken for public use." (U.S. Const., 5th Amend.) In *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 322 [107 S.Ct. 2378, 2389-2390, 96 L.Ed.2d 250] (*First English*), the United States Supreme Court held that a property owner could recover compensation for a temporary taking.

*First English* involved a Los Angeles County ordinance that the plaintiff alleged prohibited all use of its property. (*First English, supra*, 482 U.S. at p. 308 [107 S.Ct. at p. 2382].) The plaintiff asserted that the ordinance constituted a taking of its property for public use, and it sought just compensation. (*Ibid.*) The trial court and California Court of Appeal ruled that plaintiff was not entitled to compensation unless the county opted to retain the ordinance following a judicial determination that the ordinance constituted a taking. (*Id.* at pp. 308-309 [107 S.Ct. at pp. 2382-2383].) In other words, these courts held that no taking could occur during the period of litigation over the validity of the ordinance. The United States Supreme Court disagreed, holding that, even if the county withdrew the ordinance as a result of the litigation, it still owed compensation for the temporary period the ordinance was in effect. (*Id.* at p. 322 [107 S.Ct. at pp. 2389-2390].)

Here, the California Coastal Commission (Commission) made clear that it opposed the lot line adjustment that created Landgate's lot, and therefore

opposed all development of Landgate's property regardless of the magnitude of the development. The Commission's decision denying Landgate's application for a development permit had the same impact on Landgate as the ordinance in *First English* had on the plaintiff in that case. Landgate sued the Commission and successfully established that the Commission's decision was wrong under state law and also that it constituted a taking. The Commission then approved development of Landgate's property, thereby preventing Landgate from asserting a permanent taking. Under these circumstances, *First English* makes clear that the Commission must pay compensation for the *temporary* taking that occurred while its total ban on development of Landgate's property was in effect.

The majority notes that the high court did not decide in *First English* whether "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like" would amount to a temporary taking. (*First English*, *supra*, 482 U.S. at p. 321 [107 S.Ct. at p. 2389].) The majority argues that this case involves a "normal delay" in the permit approval process, not a temporary taking. (Maj. opn., *ante*, at pp. 1010, 1030.) I disagree. When a regulatory agency prohibits all use of a particular property, and the property owner is forced to sue the agency to get it to change its position, its stonewalling is not fairly characterized as a "normal delay" in the permit approval process. Here, the Commission's denial of Landgate's development permit was not, as the majority argues, "conditional," merely calling for some reasonable act of compliance by Landgate. (Maj. opn., *ante*, at p. 1028.) Rather, the Commission made clear that it would not approve any development on Landgate's lot regardless of the circumstances. Nor did the Commission in this case temporarily delay the permit approval process "pending resolution of a threshold issue." (Maj. opn., *ante*, at pp. 1029, 1030.) Rather, the Commission flatly denied the permit, and its decision was final in every sense. The Commission was not planning to take any further action. Landgate had to sue the Commission to get relief.

In his dissent in *First English*, Justice Stevens articulated the precise argument on which the majority relies here. Specifically, Justice Stevens asserted, as does the majority here (maj. opn., *ante*, at p. 1030), that litigation over the validity of a land use restriction is simply a "normal delay[]" in the permit approval process and therefore cannot give rise to a temporary taking. (*First English*, *supra*, 482 U.S. at p. 334 [107 S.Ct. at p. 2396] (dis. opn. of Stevens, J.).) Justice Stevens stated: "The Court's analysis . . . appears to erect an artificial distinction between 'normal delays' and the delays involved in obtaining a court declaration that the regulation constitutes a taking. [¶] *In my opinion, . . . [l]itigation challenging the validity of a land-use restriction gives rise to a delay that is just as 'normal'*

*as an administrative procedure seeking a variance or an approval of a controversial plan."* (*Id.* at pp. 334-335 [107 S.Ct. at p. 2396] (dis. opn. of Stevens, J.), italics added, fns. omitted.) Thus, Justice Stevens would have held that litigation over the validity of a land use regulation, like other "normal delays" in the permit approval process, cannot give rise to a temporary taking even if the regulation deprives the property owner of all use of its property. The majority of the high court considered Justice Stevens's argument *and rejected it.* Now, the same argument has found new life in the majority opinion here.

I agree with the majority "that a government agency may deny a development permit when the reasonable conditions imposed on development are not met . . . ." (Maj. opn., *ante,* at p. 1027.) I also agree that "a judicial determination of the validity of certain *preconditions to development* is a normal part of the development process, and . . . does not constitute a per se temporary taking." (Maj. opn., *ante,* p. 1030, original italics.) Nevertheless, if the "preconditions to development" have the effect of prohibiting all use of the property regardless of the circumstances, then they constitute a taking. If those preconditions are permanent, then the taking is permanent; if those preconditions are temporary, then the taking is temporary. The majority cites numerous cases (maj. opn., *ante,* at pp. 1030-1031) in which litigation delay was "a normal part of the regulatory process." (Maj. opn., *ante,* at p. 1031.) I find these cases irrelevant to the issue before us. First, these cases do not address whether the litigation delay constituted a temporary taking. Second, I do not argue that, in this case, the litigation delay by itself gave rise to the temporary taking; rather, I argue that the Commission's total and final ban on all use of Landgate's property (which existed during the litigation delay) gave rise to the temporary taking. As long as that total ban was in effect, the temporary taking continued.

In *First English,* the court held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." (*First English, supra,* 482 U.S. at p. 321 [107 S.Ct. at p. 2389].) The majority would limit this holding to cases involving "the passage and enforcement of a *law or regulation* that deprives property of all value." (Maj. opn., *ante,* at p. 1021, italics added.) I find no basis in *First English* for this limitation. Here, the policies reflected in the Commission's adjudicative decision, like the ordinance at issue in *First English,* "worked a taking of all use of property," and nothing "can relieve [the Commission] of the duty to provide compensation for the period during which the taking was effective." (*First English, supra,* 482 U.S. at p. 321 [107 S.Ct. at p. 2389].)

Accordingly, I dissent.

Baxter, J., concurred.

**BROWN, J.,** Dissenting.—The more things change, the more they remain the same. That is certainly true with respect to this court's takings jurisprudence. Almost 20 years ago, Justice Brennan, dissenting in *San Diego Gas & Electric Co.* v. *San Diego* (1981) 450 U.S. 621, 636 [101 S.Ct. 1287, 1296, 67 L.Ed.2d 551], charged this court with sacrificing the right to just compensation guaranteed by the Fifth Amendment on an altar "of policy judgments made by the . . . judicial branch[]." (*Id.* at p. 661 [101 S.Ct. at p. 1309], fn. omitted.) Although the deference commanded by the high court's precedents is not always "absolute," when it has made an attempt to resolve definitively a difficult point of constitutional law that is applicable to the very issue before us, we ought either to respect its judgment or provide a reasoned basis for refusing to do so. To do otherwise, in Charles Fried's words, is "judicial impudence." (Fried, *Impudence* (1992) Sup. Ct. Rev. 155, 157, 192-193.)

I dissent.

Viewing pure democracy as incompatible with personal security or the rights of property (Madison, The Federalist No. 10 (Rossiter ed. 1961) p. 81),[1] the drafters of our Constitution went to extraordinary lengths "to control the governed" and to "oblige [the government] to control itself." (Madison, The Federalist No. 51, *supra*, at p. 322.) By adopting the Constitution, the people of the United States "manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed." (*Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87, 138 [3 L.Ed. 162, 178].)

The prohibition of the takings clause is one expression of the constitutional commitment to limiting government and maximizing individual liberty. The protection of private property guaranteed by the Fifth Amendment presupposes the property is sought for legitimate purposes, out of a desire to improve the public condition. It nevertheless prohibits appropriation of property—even for such beneficial purposes—without just compensation. The difficulty inherent in trying to reconcile popular self-government with private ownership of property has propelled the Supreme Court's takings

---

[1]Had the Federalists lost the argument, our republic might more closely resemble P.J. O'Rourke's wry description, "The whole idea of our government is this: If enough people get together and act in concert, they can take something and not pay for it." (O'Rourke, Parliament of Whores (1991) p. 232.)

doctrine along an erratic course, from protection of property rights as a matter of fixed principle to ad hoc balancing tests and back to categorical rules. The result has been justifiably criticized as muddled.

"[R]ecent cases," according to one scholar, "have done little to clarify the [Takings] Clause, and the doctrine remains in perplexing disarray." (McUsic, *Looking Inside Out: Institutional Analysis and the Problem of Takings* (1998) 92 Nw. U. L.Rev. 591, 592, fn. 2 [citing treatises and law review articles over the past 15 years]; Schroeder, *Never Jam To-day: On the Impossibility of Takings Jurisprudence* (1996) 84 Geo. L.J. 1531.) Despite the general impossibility of its takings jurisprudence, in *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003 [112 S.Ct. 2886, 120 L.Ed.2d 798] (*Lucas*), the United States Supreme Court made a heroic effort to bring a measure of clarity to an analytical framework that has grown doctrinally more difficult as it has become politically more fundamental. After embracing an intractably complex, ad hoc "balancing test" in *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [98 S.Ct. 2646, 2659, 57 L.Ed.2d 631] (*Penn Central*), the court in *Lucas* enunciated the clear rule which should govern our decision in this case: "In 70-odd years of succeeding 'regulatory takings' jurisprudence [i.e., following *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321]], we have generally eschewed any ' "set formula" ' for determining how far is too far, preferring to 'engag[e] in . . . ad hoc, factual inquiries.' [Citations.] We have, however, described at least *two discrete categories* of regulatory action as compensable *without case-specific inquiry* into the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property. . . . [¶] The second situation in which we have found *categorical* treatment appropriate is where regulation *denies all economically beneficial or productive use* of land. [Citations.]" (*Lucas, supra*, 505 U.S. at p. 1015 [112 S.Ct. at p. 2893], italics added.)

If *Lucas* means what it says, it establishes a categorical rule. No amount of judicial legerdemain can transform its objective, bright-line standard into a license for courts to engage in prohibited forms of "case-specific inquiry into the public interests advanced in support of" (*Lucas, supra*, 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]) a given restraint.

After paying grudging lip service to *Lucas*'s categorical rule, the majority falls back on *Penn Central*'s squishy "multi-factor" test, a standard so amorphous it is capable of producing virtually any result. This is the very test *Lucas* overruled pro tanto in cases, like this one, where the restraint at issue denies *all* economic use. The tortuous logic by which today's majority

decides an order of the coastal commission—one that finally and unqualifiedly denied the landowners here *all* use of their property for over *two years*—was a mere "temporary delay" is worth examining in detail.

First, the majority resuscitates the *Penn Central* test in this case by ignoring another equally clear precedent. In *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [107 S.Ct. 2378, 96 L.Ed.2d 250] (*First Lutheran*), the United States Supreme Court concluded that temporary takings are compensable, repudiating this court's contrary holding in *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25]. The majority dismisses the holding in *First Lutheran* as "narrow[]"; confined to its facts; requiring the existence of a final administrative decision before the presence of a constitutional violation can be determined; a case which did not hold that the "mere" assertion of regulatory jurisdiction constituted a taking; and so on. (Maj. opn., *ante*, at pp. 1017-1018.) But even if we accept all of the majority's quibbles, both *Lucas* and *First Lutheran* indisputably apply here.

Mystifyingly, the majority then instructs us that "[v]irtually every court that has examined the issue has concluded . . . that a regulatory mistake resulting in delay does *not*, by itself, amount to a taking of property." (Maj. opn., *ante*, at p. 1018.) True enough. But none of the 10 cases cited in support of this patently obvious conclusion refutes the plaintiff property owners' claim for just compensation in this case.

Two of these "noncompensable delay" cases preceded *Lucas*; in the remainder, the court found either that the agency had *not* reached a final decision or that the regulation did not deny the owner *all* beneficial use. (See *Littoral Development Co.* v. *San Francisco Bay Conservation etc. Com.* (1995) 33 Cal.App.4th 211, 221-222 [39 Cal.Rptr.2d 266] [no final decision]; *Del Oro Hills* v. *City of Oceanside* (1995) 31 Cal.App.4th 1060, 1065 [37 Cal.Rptr.2d 677] [no final decision]; *Jacobi* v. *City of Miami Beach* (Fla.Dist.Ct.App. 1996) 678 So.2d 1365, 1366 [no denial of all economic use]; *Cannone* v. *Noey* (Alaska 1994) 867 P.2d 797, 801 [same]; *Dumont* v. *Town of Wolfeboro* (1993) 137 N.H. 1 [622 A.2d 1238, 1244] [same]; *Tabb Lakes, Ltd.* v. *U.S.* (Fed. Cir. 1993) 10 F.3d 796, 798 [no final decision]; *Steinbergh* v. *City of Cambridge* (1992) 413 Mass. 736 [604 N.E.2d 1269, 1274] [no denial of all economic use]; *Smith* v. *Town of Wolfeboro* (1992) 136 N.H. 337 [615 A.2d 1252, 1257-1258] [same]; *1902 Atlantic Ltd.* v. *U. S.* (1992) 26 Cl.Ct. 573 [pre-*Lucas* decision applying *Penn Central* analysis]; *Lujan Home Builders* v. *Orangetown* (1991) 150 Misc.2d 547 [568 N.Y.S.2d 850, 851] [due process rather than takings analysis].)

*Lucas* itself teaches that its categorical rules do not apply unless the restraint at issue deprives the property owner of all economic use. (*Lucas*,

*supra,* 505 U.S. at pp. 1015-1019 [112 S.Ct. at pp. 2893-2895].) Other takings cases make clear the high court's "insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." (*MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 351 [106 S.Ct. 2561, 2567, 91 L.Ed.2d 285] (*MacDonald*); see also *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 186 [105 S.Ct. 3108, 3116, 87 L.Ed.2d 126] (*Williamson County*) ["Because respondent has not yet obtained a final decision regarding the application of. the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe."].) As the court has stated, however, the role served by the ripeness requirement in the takings context is "prudential": to make clear "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. [Citations.] Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." (*Williamson County, supra,* 473 U.S. at p. 191 [105 S.Ct. at p. 3118]; see *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.* (1981) 452 U.S. 264 [101 S.Ct. 2352, 69 L.Ed.2d 1] (*Hodel*).)

Only recently, the court underlined the limited contours of "ripeness" in the takings context. In *Suitum* v. *Tahoe Regional Planning Agency* (1997) 520 U.S. 725 [117 S.Ct. 1659, 137 L.Ed.2d 980], it said that cases such as *Williamson County, MacDonald,* and *Hodel* "addressed the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body *invested with great discretion, which it has not yet even been asked to exercise.* No such question is presented here." (*Id.* at p. ___ [117 S.Ct. at p. 1667], italics added; see also *Lucas, supra,* 505 U.S. at pp. 1011-1012 [112 S.Ct. at pp. 2890-2891].) It is that administrative flexibility that lies behind and justifies the prudential ripeness rule in the takings context. Those concerns simply have no bearing in this case, however, where the commission made clear the extent to which it would permit plaintiffs to develop their lot: not at all. The cases relied on by the majority are thus wide of the only issue presented: Did the commission's definitive refusal to permit plaintiffs to make *any* use of their property—a refusal that continued until, after two years of litigation, plaintiffs obtained judicial relief—"den[y] all economically beneficial or productive use of [their] land." (*Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893].)

This is not a case in which the property owners contend, as the majority would have it, that "a regulatory mistake resulting in delay . . . , by itself,

amount[s] to a taking of property." (Cf. maj. opn., *ante*, at p. 1018.) That is not, and never has been, the law of takings. Rather, plaintiffs' argument—and the essential meaning of both *Lucas* and *First Lutheran*—is that a *final* decision by a regulatory agency that denies *all* economically beneficial use of the property, even temporarily, is a per se compensable Fifth Amendment taking.[2] If that is so, then plaintiffs' property has been "taken," however temporarily, by the commission's order, and the payment of "just" compensation is constitutionally compelled. As both the trial court and the Court of Appeal concluded, that is what happened here.

The majority dodges the otherwise inevitable result by changing the question: "The present case poses the issue of whether a legally erroneous decision of a government agency during the development approval process resulting in delay constitutes a temporary taking of property." (Maj. opn., *ante*, at p. 1018.) "Legally erroneous"? "Process"? "Delay"? Of course mere "delay" in a "process" resulting from an "erroneous decision" does not qualify as a constitutional violation. If it did, every "mistake" by government land use authorities leading to any delay in the owner's use of her property would require compensation. A massive raid on the public fisc would ensue. Suppose, however, the question were differently, more evenhandedly, framed as one that "poses the issue of whether a regulatory decision barring any use of property until the agency's decision is overturned by a court constitutes a temporary taking of property?" What result then? That, rather than the majority's tendentious formulation, is the issue presented by this case.

In any event, the majority's trick question has already been asked and answered. As Justice Chin points out in his dissent (see dis. opn. of Chin, J., *ante*, at pp. 1033-1034), the identical position espoused by the majority—that litigation over the validity of a land use restriction is simply a "normal delay" in the permit approval process and thus cannot give rise to a temporary taking—was advanced by Justice Stevens in his *dissenting opinion* in *First Lutheran*. (See 482 U.S. at pp. 334-335 [107 S.Ct. at pp. 2396-2397].) The precise issue has thus already been considered and rejected by the high court. (See dis. opn. of Chin, J., *ante*, at p. 1034.)

---

[2] As *Lucas* itself and following cases have pointed out, there is one recognized exception even to the court's categorical takings rule. If the government can demonstrate that controlling principles of "background law"—typically embodied in a state's nuisance law—do not permit the use at issue, compensation is not required. (See 505 U.S. at p. 1029 [112 S.Ct. at p. 1200] ["A law or decree with such an effect [i.e., prohibiting all economically beneficial use] must . . . do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners . . . under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally. . . ." (Fn. omitted.)].)

If *Lucas* lays down a categorical rule, and if, as *First Lutheran* concludes, a final order that *temporarily* deprives a property owner of *all* economically beneficial use is a compensable taking, these propositions ought to readily yield a clear answer, one that does not depend on the majority's elaborate, even arduous, preliminary discussion. (Cf. *Florida Rock Industries, Inc.* v. *U.S.* (Fed. Cir. 1994) 18 F.3d 1560, 1564-1565 [*Lucas* "teaches that the economic impact factor alone may be determinative; in some circumstances, no balancing of factors is required. If a regulation categorically prohibits *all* economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, *without more*, a compensable taking." (Fns. omitted, second italics added.)].)

What the Supreme Court's categorical rule in *Lucas* means for property owners, and what the majority refuses to acknowledge, is that after *Lucas*, Justice Holmes's famous apothegm in the *Rock Island Railroad* case, that "Men must turn square corners when they deal with the Government" (*Rock Island & c. R. R.* v. *United States* (1920) 254 U.S. 141, 143 [41 S.Ct. 55, 56, 65 L.Ed. 188]) is now reciprocal. Following *Lucas*, in a limited class of cases, regulators whose *final* action denies an owner *all* beneficial economic *use* of land are on notice that, if their decisions prove wrong when tested in court, the government may face a damages judgment for a temporary taking even if the restraint is later rescinded. In this context at least, it is *government* that must turn square corners when it attempts to overregulate the use of private property or is in danger of "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (*Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554]; *Lucas, supra,* 505 U.S. at p. 1018 [112 S.Ct. at pp. 2894-2895].)

To further confuse the discussion, the majority plunges into a lengthy disquisition on the connection between the land use regulation at issue here and the legitimate governmental purposes it arguably advances. This, of course, is the formulation developed in *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304], and *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677], a "nexus" test that is precluded by the categorical rule in *Lucas*. Indeed, the very nature of *Lucas*'s categorical rule appears to bar a court from conducting a case-specific inquiry into those interests that might justify the restraint imposed on the plaintiffs' use of their property by the commission's order. (*Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893] ["We have . . . described . . . two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint."].)

Although Justice Holmes's caution that when regulation "goes too far it will be recognized as a taking" is foundational to much takings jurisprudence (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [43 S.Ct. 158, 160, 67 L.Ed.2d 322, 28 A.L.R. 1321]), the high court "ha[s] never set forth the justification for this rule." (*Lucas, supra,* 505 U.S. at p. 1017 [112 S.Ct. at p. 2894].) As Justice Scalia explains: "Perhaps it is simply . . . that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. [Citation.] . . . Surely, at least, in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted, it is less realistic to indulge our usual assumption that the legislature is simply 'adjusting the benefits and burdens of economic life' [citation] in a manner that secures an 'average reciprocity of advantage' to everyone concerned [citation]. And the *functional* basis for permitting the government . . . to affect property values without compensation . . . does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses." (505 U.S. at pp. 1017-1018 [112 S.Ct. at p. 2894], italics in original.)

"On the other side of the balance," the *Lucas* majority continued, "affirmatively supporting a compensation requirement, is the fact that regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm. [Citations.] As Justice Brennan explained: 'From the government's point of view, the benefits flowing to the public from preservation of open space through regulations may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property.' " (505 U.S. at p. 1018 [112 S.Ct. at pp. 2894-2895].) In short, Justice Scalia concluded, "there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial use in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." (505 U.S. at p. 1019 [112 S.Ct. at p. 2895], fn. omitted, italics in original.)

It is evident the majority is unwilling to come to terms with the true meaning and operative effect of *Lucas* and *First Lutheran.* At every turn, its opinion reflects the abiding conviction that takings jurisprudence has not advanced a single step beyond the "regulatory friendly" analysis of *Penn Central.* At every opportunity, the majority reverts to *Penn Central*'s ad hoc factual inquiry. Limning all this reasoning is the vocabulary of "balance." Instead of confronting the meaning of *Lucas* as it applies in this case, the

majority chatters endlessly of "delay . . . owing to the mistaken assertion of jurisdiction" (maj. opn., *ante*, at p. 1010), " 'normal delay' " (*ibid.*), "normal delay rather than a temporary taking" (*ibid.*), "legally erroneous decision . . . during the development . . . process resulting in delay" (*id.* at p. 1018), "reasonable regulatory process designed to advance legitimate government interests" (*id.* at p. 1021), "[m]ere fluctuations in value during the process of government decisionmaking" (*ibid.*), "mistaken assertion of jurisdiction" (*ibid.*), "normal development delay" (*id.* at p. 1026), "conditional denial" (*id.* at p. 1028), "condition . . . erroneously imposed" (*ibid.*), "plausible, though perhaps legally erroneous" (*ibid.*), "postponement of development" (*id.* at p. 1029), "bona fide dispute" (*id.* at p. 1031), "delay [as] an incident of property ownership" (*ibid.*), and plaintiffs' "unfortunate position of suffering from a delay." (*Ibid.*) Thus is reality ruthlessly revised. (Cf. *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. at p. 831 [107 S.Ct. at p. 3145] ["To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather . . . 'a mere restriction on its use,' . . . is to use words in a manner that deprives them of all their ordinary meaning."].)

The majority's discussion concludes with a proposition that is flatly incompatible with *Lucas*: "[W]e must determine not whether a sinister purpose lurked behind the [c]ommission's decision, but rather whether the development restrictions imposed . . . *substantially advanced some legitimate state purposes so as to justify the denial of the development permit.*" (Maj. opn., *ante*, at p. 1022, italics added.) Had *Lucas* never been decided; had the commission not denied plaintiffs *all* use of their property; had *Penn Central*'s ad hoc test the slightest relevance to this case, the majority's conclusion might have *some* bearing here. But none of these things is true.

The remainder of the majority opinion continues to joust with its own strawman. Yet, to repeat: The test is not "whether the development restrictions imposed on the subject property substantially advanced some legitimate state purposes." (Maj. opn., *ante*, at p. 1022.) That formula, lifted from *Penn Central*, simply is no longer relevant under the circumstances here; indeed, the inquiry is barred by *Lucas*. And the majority's conclusion—that though the commission may have been "mistaken given the peculiar facts of this case, its position was not so objectively unreasonable as to give rise to the inference that it was adopting that position solely for purposes of delay or some other illegitimate reason" (maj. opn., *ante*, at p. 1025)—is obstinately beside the point.

The majority persistently misstates and mischaracterizes both the issue before us and governing takings law. In the end, however, the majority is

finally forced to concede the meaning of *First Lutheran:* "[*It*] . . . *stands for the proposition that once a government action finally denies all economically viable use of property, the fact that the government later rescinds that action after a judicial proceeding does not relieve it of its duty to pay compensation.*" (Maj. opn., *ante*, at p. 1030, italics added.)

Yes, exactly; and *that* is *this* case. As plaintiffs point out, were that not the law, the holding of *Lucas* would be emasculated. If *any* "threshold," "jurisdictional" assertion by a government land use agency that has the effect of barring all economically beneficial use of property can be converted into "the recognition that a judicial determination of the validity of certain *preconditions to development* is a normal part of the development process" (maj. opn., *ante*, at p. 1030, italics in original), then, in California, at least for now, *Lucas* is a dead letter.

## CONCLUSION

When the answer to every question about what the public needs or wants or should have is always "more," the demand for free public goods is infinite. Against this relentless siphon, the takings clause, and the courts' ardent defense of it, stands as a last lonely bulwark of property rights. It is, and will continue to be, a difficult rampart to maintain. That difficulty is built right into our constitutional structure. But, in one area at least we have arrived at a clear understanding: When the government denies all economically viable use of property, even temporarily, it may not achieve its ends "by a shorter cut than the constitutional way of paying for the change." (*Penna. Coal Co.* v. *Mahon, supra*, 260 U.S. at p. 416 [43 S.Ct. at p. 160].) In these limited circumstances, government must turn square corners—except in California.

Baxter, J., concurred.